[No. 15923-6-II.    Division Two.    April 19, 1994.]

THE STATE OF WASHINGTON, *Appellant,* v. THOMAS
BARRY MOORE, *Respondent.*

790

*Arthur D. Curtis, Prosecuting Attorney,* and *Dennis Hunter, Deputy,* for appellant.

*James J. Sowder,* for respondent (appointed counsel for appeal).

ALEXANDER, J. — The State of Washington appeals an order of the Clark County Superior Court imposing an exceptional sentence below the standard range on Thomas Barry Moore following his conviction on 14 felony charges. It contends on appeal that several of the sentencing court's findings of fact are not supported by the record, the reasons for the sentence are inadequate as a matter of law, and the sentence is clearly too lenient. We affirm.

In 1991, the Clark-Skamania Narcotics Task Force began an investigation into an alleged stolen property and controlled substance operation in the Vancouver area. As part of their investigation, undercover task force officers set up several controlled buys of marijuana from Willmer Bunney, the alleged leader of the operation.[1] In each instance, an under-

---

[1]The investigation was triggered by the arrest of two men for several Vancouver burglaries. One of the men, Darrell Gunn, informed police that he and another

cover officer, Doug Luse, delivered what purported to be stolen appliances to Bunney in exchange for marijuana or, in some instances, cash. The investigation revealed, further, that Thomas Barry Moore was performing work for Bunney and was involved in the criminal activity to some degree.

Moore and Bunney were thereafter charged as codefendants with one count of leading organized crime, seven counts of unlawful delivery of a controlled substance, two counts of trafficking in stolen property in the first degree, eight counts of attempted trafficking in stolen property in the first degree, and one count of possession of a controlled substance with intent to deliver. Bunney eventually pleaded guilty to the charge of leading organized crime, the State agreeing to recommend that he serve 57 months in prison and pay a fine of $150,000.[2] All remaining counts against Bunney were to be dismissed upon entry of his plea.

Moore declined plea offers proposed by the State and proceeded to trial.[3] A jury found Moore guilty of 14 counts.[4] At sentencing, the State recommended that Moore, whose offender score was 24 due to the extensive number of con-

---

man, Doug Jackson, had sold stolen items to Bunney after Moore had told them that Bunney might be interested in purchasing the stolen goods. This transaction forms the basis of the trial court's findings of fact 4, 7, and 8.

[2] RCW 9A.82.060 provides:

"**Leading organized crime.** (1) A person commits the offense of leading organized crime by:

"(a) Intentionally organizing, managing, directing, supervising, or financing any three or more persons with the intent to engage in a pattern of criminal profiteering activity; or

"(b) Intentionally inciting or inducing others to engage in violence or intimidation with the intent to further or promote the accomplishment of a pattern of criminal profiteering activity."

[3] According to the State's brief, the State offered at various times to recommend what it considered was a lenient sentence if Moore would plead guilty to 4 of 14 charges, cooperate with the State, and give truthful testimony against other involved parties.

[4] Moore was convicted of five counts of unlawful delivery of a controlled substance, six counts of attempted trafficking in stolen property in the first degree, two counts of trafficking in stolen property in the first degree, and one count of possession of a controlled substance with intent to deliver.

victions, receive an 84-month sentence, which was at the high end of the standard range. The sentencing judge rejected the recommendation and imposed an exceptional sentence of 36 months, which was 27 months below the low end of the standard range. In support of the sentence, the sentencing judge made findings of fact which, in pertinent part, are as follows:

1. From May of 1991 through December 10, 1991, the Defendant was associated with the co-defendant, Willmer Bunney, in the sale of marijuana in Clark County, Washington and in the trafficking of stolen property. Mr. Bunney was the principal organizer and director of that criminal operation. He hired the Defendant to assist him from time to time in lifting heavy objects for which he had traded marijuana. Mr. Bunney provided the money to finance the operation and accepted the stolen property he received in return for the marijuana or cash for his own exclusive benefit. He would occasionally compensate the Defendant with small amounts of marijuana and cash.

2. There is no evidence to show that the Defendant reaped even moderate economic benefits from the criminal activity. From time to time in the last two years, he has lived with various people or in his car because he did not have a place to stay.

3. Willmer Bunney operated an [sic] grow operation in Astoria, Oregon that was clearly financed and managed by himself. The Defendant has minimal involvement in unloading equipment and supplies in Astoria at the direction of Mr. Bunney. The Defendant was also involved in repair work for Mr. Bunney in Astoria.

4. The Defendant did occasionally direct certain individuals to Mr. Bunney for the purpose of trafficking in stolen property.[5] The evidence shows that the Defendant knew the trafficking in stolen property was taking place and that at times Mr. Bunney exchanged marijuana for the stolen property. However, the evidence clearly shows that Mr. Bunney was the prime operator of the activities and the person whom law enforcement focused on in its undercover operation. Mr. Bunney needed the Defendant to lift the heavy items because his previous open heart surgery rendered it unsafe for him to lift heavy items.

. . . .

6. There was no evidence to suggest that the Defendant occupied a high position in a drug hierarchy of production and

---

[5]Moore introduced Darrell Gunn and Doug Jackson to Bunney after Gunn and Jackson told Moore that they had some stolen property for sale.

distribution. Willmer Bunney was the principal operator. The Defendant did not have a high degree of sophistication in his involvement in the organization, nor was he involved in the planning of the sale of marijuana or the purchase of stolen property. There is no evidence to show that the Defendant was involved in the manufacture of marijuana, nor is there any evidence that the Defendant was associated with or had in his possession weapons at the scene of a grow operation or weapons for the protection of a manufacture or distribution system of a controlled substance or trafficking in stolen property. With the exception of one (1) .22 calibre revolver, the numerous weapons uncovered in the search of Mr. Bunney's residence were within Mr. Bunney's house, where the Defendant was only allowed to enter as a guest.

7. . . . The delivery of a controlled substance counts involved Mr. Bunney exchanging marijuana or cash for what was believed to be stolen property to undercover agent Detective Douglas Luse. The evidence at trial, including transcripts and body wires, show [*sic*] that the Defendant said very little to Detective Luse. All negotiations were between Detective Luse and Mr. Bunney as to price for any particular appliance and as to what appliances were desirable. The trafficking in stolen property counts involved the Defendant introducing two men who had stolen property for sale to Mr. Bunney. The one count involving possession of a controlled substance with the intent to deliver was the result of the Defendant driving a truck in which Mr. Bunney had stored marijuana of which he agreed to sell part to Detective Luse. . . .

8. In reference to the convictions for trafficking in stolen property, the Defendant's involvement was limited to directing the men with the stolen property to Willmer Bunney. He was not involved in negotiating the price Mr. Bunney paid for the stolen property. All of the stolen property or alleged stolen property (acquired from Detective Luse) was received by Mr. Bunney for his own benefit. It was stored either at his house in Vancouver or at his grow operation in Astoria. The Defendant did not have dominion and control over the stolen property after Mr. Bunney acquired it.

Based on these findings, the sentencing judge concluded that:

2. R.C.W. 9.94A.390 provides a non-exclusive list of mitigating factors the Court may use in determining the sentence below the standard range. In reviewing the factors, the Court concludes that the operation of the multiple offense policy of R.C.W. 9.94A.400 results in a presumptive sentence that is clearly excessive in light of the purpose of this chapter, as expressed in R.C.W. 9.94A.010. That purpose includes insuring that the punishment for a criminal offense is proportionate

to the seriousness of the offense and the offender's criminal history, promoting respect for the law by providing punishment which is just, by being commensurate with the punishment imposed upon others committing similar offenses, protecting the public, offering the offender an opportunity to improve him or herself, and making frugal use of the State's resources.

The Defendant should not be punished for taking the case to trial. The State's recommendation at sentencing was 84 months. In plea bargain offers prior to sentencing, the State's offers varied from 40 months to 33 months. Since the crimes are nonviolent, the value in protecting the public decreases the need for a lengthy prison term. Given the Defendant's reduced involvement in the activities, as compared to Mr. Bunney, it makes more frugal use of the State's resources to impose a prison term of 36 months. A prison term of 36 months is proportionate as compared to the State's recommendation for Mr. Bunney who had substantially higher involvement in the offenses. The respect for the law by providing a punishment which is just is enhanced by a 36 month prison term because it will provide sufficient inducement to the Defendant and warning to others that such involvement, even at the Defendant's minimal level, will result in a prison term.

The State appeals, claiming that the trial court erred in imposing an exceptional sentence below the standard range.

■ To reverse a sentence that is below the standard range, the appellate court must find:

(a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for that offense; or (b) that the sentence imposed was clearly . . . too lenient.

RCW 9.94A.210(4). Under the first prong of part (a), the reviewing court must determine if the reasons given by the sentencing judge for the exceptional sentence are supported by the record. Because this is a factual determination, the reasons will be upheld unless they are clearly erroneous. *State v. Sanchez*, 69 Wn. App. 255, 258, 848 P.2d 208, *review denied*, 122 Wn.2d 1007 (1993). If the reasons supplied by the sentencing judge find sufficient support in the record, then, under the second prong of part (a), the reviewing court must determine whether the reasons justify a departure outside the standard range. Review is de novo,

the standard being whether the reasons for the exceptional sentence are justified as a matter of law. *State v. Allert*, 117 Wn.2d 156, 163, 815 P.2d 752 (1991); *State v. Nordby*, 106 Wn.2d 514, 518, 723 P.2d 1117 (1986). To uphold the sentence, this court must find, considering the purposes of the Sentencing Reform Act of 1981 (SRA), that the factors justifying the exceptional sentence are sufficiently "substantial and compelling" and do not duplicate factors already considered in computing the standard range. RCW 9.94A.120(2); *Sanchez*, 69 Wn. App. at 259; *State v. Chadderton*, 119 Wn.2d 390, 395, 832 P.2d 481 (1992).

If an exceptional sentence downward is justified under both prongs of RCW 9.94A.210(4)(a), the reviewing court must then determine whether, under part (b) of RCW 9.94A.210(4), the sentence imposed by the sentencing judge was clearly too lenient. The standard of review on this inquiry is "abuse of discretion". *Allert*, 117 Wn.2d at 163. A sentence will be deemed clearly too lenient only if the trial court's determination was one that no reasonable person would have taken. *State v. Pascal*, 108 Wn.2d 125, 139, 736 P.2d 1065 (1987).

### A

#### FINDINGS OF FACT

■ At the outset, we must deal with Moore's contention, based on RAP 10.3,[6] that we should not consider the State's challenge to the sentencing judge's findings because the State did not set out a separate concise statement of each error the State contends was made by the trial court. Where the nature of the challenge is clear, however, and the findings being challenged are set forth in the appellate brief, an appellate court may consider the merits of the challenge. *State v. Estrella*, 115 Wn.2d 350, 355, 798 P.2d 289 (1990);

---

[6]RAP 10.3 states:

"(a) Brief of Appellant or Petitioner. The brief of the appellant or petitioner should contain under appropriate headings. . . .

". . . .

"(3) *Assignments of Error.* A separate concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error."

*State v. Williams*, 96 Wn.2d 215, 220, 634 P.2d 868 (1981); *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 709-10, 592 P.2d 631 (1979); *see also* RAP 1.2(a) (rules liberally interpreted to promote justice). It is clear to us, from reading the State's brief, which portions of the trial court's findings that it is challenging. We, therefore, elect to address the challenge to the findings of fact.

The State contends that the trial court erred in entering findings to the effect that Moore was only assisting Bunney from "time to time", that Moore's involvement in the illegal operation was "minimal", and that Moore was not "involved in the planning of sales of marijuana nor the purchasing of stolen property". Br. of Respondent, at 17. The State argues that the record demonstrates that Moore's involvement was more than minimal and that he was an active participant in the illegal operation. As support for this assertion, it points to portions of the record indicating that Moore worked for Bunney on numerous occasions lifting and transporting stolen goods, assisting Bunney in building a "marijuana grow room", and acting as an "advance man" for Bunney. The State also asserts that:

> the evidence in the case reflects the defendant initiated or planned at least two sales of stolen property which form the basis of his conviction for Counts XVI and XVII and his liability as a principal. In addition, the defendant was involved in the carrying out of plans for other deliveries of controlled substances and stolen goods for which he was convicted by the jury.

Br. of Appellant, at 17.

Although the record demonstrates that Moore's activities facilitated the marijuana-stolen property operation to some degree, we agree with the trial court that his participation was merely incidental to the overall criminal enterprise. Clearly his involvement was not as great as Bunney's. Indeed, Bunney testified that he was the only one who handled cash and that Moore was not involved in the handling or packaging of the marijuana. Bunney also stated that he did not consider Moore to be a partner and did not inform Moore of the prices he was paying for the stolen

property. Bunney indicated, further, that Moore "basically did what [Bunney] told him", and did not receive a wage or profits from the operation.[7] Finally, Bunney stated that Moore did not negotiate prices with the undercover police officer or Jackson and Gunn, and was not involved in the strategic planning of the operation. Although there was evidence that Moore helped facilitate exchanges between Bunney and Gunn and Jackson, by introducing the parties to each other, he did not participate in the ultimate transactions that took place between them.

It is apparent that Moore's primary function was to perform handyman work around Bunney's residence. His only ties with the marijuana-stolen property operation were that he accompanied Bunney to the sites of most transactions in order to lift the stolen property for Bunney. He also performed work on Bunney's house in Astoria, Oregon, where the marijuana was later grown.

The State also asserts that Moore's "high position" in the marijuana-stolen property operation demonstrates that his participation was not merely "minimal". It relies on *State v. Taatjes*, 43 Wn. App. 109, 113, 715 P.2d 1153, *review denied*, 105 Wn.2d 1020 (1986) as support for its argument that, because Moore was "[t]he actual maker of the drug [and, therefore,] occupies a high position in the [distribution] chain", his participation calls for an aggravating sentence. In short, the State contends that because Moore was the maker of the marijuana, the trial court's finding that he did not occupy a high position in the drug hierarchy was erroneous. Contrary to the State's assertion, the record does not reveal that Moore was directly involved in the manufacturing of the marijuana. Although Moore did, as we have noted, perform construction work for Bunney at Bunney's house in Astoria where the marijuana was grown, the evidence does not demonstrate that he was actually aware that

---

[7]Although no wage was formally paid to Moore by Bunney, Moore did receive small amounts of compensation (always "much less than $50") from time to time and was also allowed to reside in Bunney's trailer or motor home. Bunney conceded that, had Moore not helped him as a handyman, he would not have allowed Moore to stay free of charge for the entire time.

a grow operation was to be carried out on the premises. Bunney conceded that, although Moore helped construct the room in Astoria where marijuana was eventually grown, nothing he did in that capacity was unique to creating a room for the cultivation of marijuana.[8] Furthermore, there is no indication in the record that Moore watered the marijuana plants, cut them, packaged them, or worked around the plants. We agree with the sentencing judge that Moore only assisted Bunney from "time to time" and that his role in the operation was "minimal", especially in comparison with Bunney's role. Therefore, we conclude that the sentencing court's findings are not clearly erroneous.

B

REASONS FOR THE EXCEPTIONAL SENTENCE

1. Secondary Role

■ The State asserts that the reasons set forth by the sentencing judge, even if supported in the record, do not justify a downward departure from the standard range as a matter of law. The State cites *State v. Nelson*, 108 Wn.2d 491, 740 P.2d 835 (1987) as support for its argument that a secondary role in a crime is not a "substantial and compelling reason to leave the standard range". *Nelson*, at 492. We do not interpret *Nelson* so narrowly. In *Nelson*, a robbery case, the Supreme Court did not indicate that a secondary role in a crime cannot be a mitigating factor in sentencing. Rather, the court stated that:

> In order for a lesser degree of participation to be considered a mitigating factor, the defendant's participation must be significantly out of the ordinary for the crime in question.

*Nelson*, at 501.

We agree with the State that an accomplice and principal should be treated alike insofar as the determination of guilt or innocence is concerned. That does not mean, however, that minimal involvement in criminal activity may not be considered by a sentencing court in determining whether to impose

---

[8]The ventilation system was not installed by Moore. Moore did, however, paint the room white. This has the effect of intensifying the entering light rays. It is not clear whether Moore realized the purpose for the paint.

a sentence below the standard range. *See State v. Alexander*, 70 Wn. App. 608, 619, 854 P.2d 1105 (1993) (citing *State v. Gaines*, 65 Wn. App. 790, 830 P.2d 367 (1992)), *review granted*, 123 Wn.2d 1001 (1994). Here, the trial court's findings support a conclusion that Moore's participation was "significantly out of the ordinary for the crime in question". *Nelson*, 108 Wn.2d at 501. That being the case, the trial court did not err in departing from the standard range due to Moore's limited involvement in the marijuana-stolen property operation.

### 2. Multiple Offense Policy

Furthermore, we hold that the sentencing court correctly relied on RCW 9.94A.390(1)(g) when it determined that Moore should receive an exceptional sentence downward. RCW 9.94A.390(1)(g) provides that a court may depart from the standard guidelines range when:

> The operation of the multiple offense policy of RCW 9.94A.400 results in a presumptive sentence that is clearly excessive in light of the purpose of this chapter, as expressed in RCW 9.94A.010.

RCW 9.94A.010 indicates that the purposes of the SRA are:

> to make the criminal justice system accountable to the public by developing a system for the sentencing of felony offenders which structures, but does not eliminate, discretionary decisions affecting sentences, and to add a new chapter to Title 9 RCW designed to:
>
> (1) Ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history;
>
> (2) Promote respect for the law by providing punishment which is just;
>
> (3) Be commensurate with the punishment imposed on others committing similar offenses;
>
> (4) Protect the public;
>
> (5) Offer the offender an opportunity to improve him or herself; and
>
> (6) Make frugal use of the state's resources.

As the court in *Nelson* noted:

> The SRA contemplates departure from the range in appropriate circumstances, reflecting the legislative determination that "not all exceptional fact patterns can be anticipated". Washington Sentencing Guidelines Comm'n, *Sentencing Guidelines Imple-*

*mentation Manual* § 9.94A.390 cmt., at II-38 (1984). In such nonstandard cases, it is appropriate to give consideration to factors beyond numerically measured proportionality. Imposing a penalty which is within the standard range but unduly harsh, considering the circumstances of a case, does not "[p]romote respect for the law by providing punishment which is just". RCW 9.94A.010(2).

*Nelson,* 108 Wn.2d at 502. We are satisfied that the departure downward from the standard range was justified in Moore's case. As we have observed, Moore's involvement in the criminal operation carried on by Bunney was limited. Nevertheless, it resulted in Moore receiving a substantial number of convictions which, in turn, elevated his offender score. Considering the facts as set forth in the trial court's findings, we are satisfied that an exceptional sentence downward is warranted under the multiple offense policy.

C

WHETHER SENTENCE CLEARLY TOO LENIENT

Finally, the State asserts that the sentence imposed upon Moore was clearly too lenient. We disagree. As noted above, Moore's standard range sentence was 63 to 84 months. Moore received a sentence that was only 27 months below the low end of the standard range. In view of the circumstances of this case, we cannot say that the trial court abused its considerable discretion when it deviated from the standard range.

Affirmed.

MORGAN, C.J., and HOUGHTON, J., concur.