[No. 17717-0-II. Division Two. March 7, 1997.]

THE STATE OF WASHINGTON, *Respondent,* v. BERNARD
GILBERT "PETE" BARNES, *Appellant.*

642

TURNER, J. Pro Tem., concurs by separate opinion.

*Angela D. Anderson, Jeffrey Steinborn,* and *Steinborn & Associates,* for appellant.

*David H. Bruneau, Prosecuting Attorney* for *Clallam County,* and *Deborah S. Kelly, Deputy,* for respondent.

SEINFELD, C.J. — Bernard Barnes appeals his conviction of leading organized crime, contending that the trial court should have applied principles of double jeopardy and collateral estoppel to bar the prosecution. Clallam County had earlier brought a civil forfeiture action against Barnes based upon the same criminal conduct. That action was dismissed with prejudice on Barnes's motion for summary judgment. Barnes's 13 assignments of error also include complaints of prosecutorial vindictiveness, erroneous evidentiary rulings, an inconsistent jury verdict, juror misconduct, and insufficient evidence. He also challenges a provision of his sentence that requires him to pay $500,000 to a County fund. We conclude that policy considerations preclude the application of collateral estop-

pel under these facts. Finding no trial court error, we affirm the trial court in all respects.

## FACTS

During the relevant time period, Barnes lived in a house at 6200 Wye Road in Joyce, Washington, and owned a second residence on Lake Sutherland. He permitted Kim Smith, an acquaintance and an experienced cultivator of marijuana, to live at his Lake Sutherland home.

In 1987, Barnes hired Donald Zimmerman to build a second house on the Wye Road property near his residence. The new home, 6200-B Wye Road, contained a large unfinished basement that was not visible from the exterior. Upon completion of the house, Smith moved in.

About this same time, Barnes hired Jim Bennett to grade the lot, and Smith hired Thomas Madle, an electrician, to create a power diversion at the residence. Bennett noticed several things about the house that aroused his suspicions. He saw numerous venting mechanisms in the foundation, dirt accumulations that disappeared without any evidence of landscaping, and complete coverings over the home's windows. Suspicious of illegal activity, Bennett shared his concerns with Zimmerman. Barnes later called Bennett to say that he was glad the matter was brought to his attention.

Zimmerman then told Bennett that he and Barnes had found marijuana plants in the house, that the side of the garage had been cut out with a chain saw in order to create access to the basement from the garage, that the staircase inside the house to the basement had been removed, and that the home had closed circuit TV. Zimmerman warned Bennett that they had his picture from the TV and that "if the law found out about it, they would kill [Bennett]." Zimmerman also said that he and Barnes had evicted Smith.

Shortly thereafter, Jeffrey Wentworth, another of Barnes's acquaintances who also was experienced at cultivat-

ing marijuana, moved into the 6200-B Wye Road house with his girl friend, Randi Stansbery. Douglas Chute, another acquaintance, told authorities that he overheard Barnes and Smith discussing plans to grow marijuana in the 6200-B Wye Road house. They said "if that worked, they were going to put them underground." Chute testified at trial that Smith and Barnes had plans for four other similar houses and that individuals like Smith and Wentworth expected to share in the profits with Barnes in exchange for supplying the growing equipment, experience and labor.

In July 1990, the police executed a search warrant at the Wentworth/Stansbery house. They discovered 255 live marijuana plants in the basement, 15 operational halide lights, several venting fans, two Sonizair Polar Neutralizer units for air purification, electrical transformers for the lights, a 200 amp power diversion, venting ducts through the foundation of the house, timers that turned the lights off and on, Thermax insulation on the basement ceiling, and mylar reflecting film on the walls. In a bedroom, police found an electronic scale and in the living room "buy notices." Outside, officers found a truck that belonged to Barnes and a boat trailer that contained additional marijuana plants and various items of equipment and supplies for cultivation.

Police also found a repair order for Barnes's truck in Wentworth's name; receipts for building supplies sold to Wentworth from a local store and charged to Barnes's account; records of narcotics usage and income from sales traceable to Wentworth, Stansbery, and Smith; and phone books containing the phone numbers of Barnes, Chute, Madle, and Smith.

The officers used the evidence from this search as the basis to obtain a search warrant for Barnes's Wye Road residence. There, they seized over 13,000 documents relating to Barnes's financial transactions and his business dealings. Included was a lease for the 6200-B Wye Road house in Wentworth's name executed by Loretta Barnes

and a deed and promissory note evidencing the home's sale to Wentworth.

Clallam County filed a civil action against Barnes, his wife, and two other defendants. The complaint alleged that the defendants violated the Criminal Profiteering Act, RCW 9A.82, by possessing and conspiring to possess cocaine with the intent to deliver, committing and conspiring to commit the theft of utilities, manufacturing and conspiring to manufacture marijuana, and leading organized crime. The County sought forfeiture of considerable property that it had seized; damages in the amount of the profits from the illegal activities, RCW 9A.82.100(4)(g); civil penalties of $250,000 from each defendant, RCW 9A.82.100(1)(d); and costs of prosecution, RCW 9A.82.100(4)(e). Finding a lack of evidence to support the allegations, the trial court granted Barnes's motion for summary judgment.

The State then filed a criminal information charging Barnes with leading organized crime. It included the crimes listed in the civil complaint as predicate acts establishing the required pattern of criminal profiteering. Barnes moved for dismissal, arguing that the doctrine of collateral estoppel barred the criminal prosecution. The court denied his motion, finding that the decision in the civil case was not a final judgment on the merits and that the application of the doctrine created an injustice.

The jury retired to begin its deliberations on a Friday. After a day of deliberating, the jury sent the court a note that stated:

> We cannot reach a unanimous agreement on *any* of the 8 predicate acts with no hope of resolution (at least 3 dissenting votes on each one). Do we have to be unanimous on a verdict of not guilty in order to find Barnes not guilty on each predicate?

The trial court rejected Barnes's proposed instruction and instead told the jury to reread the instructions and continue deliberating.

On Monday afternoon the jury sent the following note to the court:

> We reviewed the instructions — *thoroughly*, per your request and understand them clearly. We have reviewed all of the evidence numerous times in great detail and remain unable to reach a unanimous verdict. *Same* vote as we had Friday with *no* way to resolve it. What do we do apart from doing "violence" to the dessenters [sic] judgments?

The trial judge declared a mistrial based on the jury's declared inability to reach a verdict.

Following a second trial, the jury found Barnes guilty of leading organized crime. It found that he led Smith, Wentworth, and Stansbery, and that he had committed the following three predicate acts: conspiracy to commit theft from the power company; conspiracy to manufacture marijuana; and possession of marijuana with intent to deliver.

The trial court sentenced Barnes to serve a midrange sentence of 60 months. It also ordered him to make full restitution to the power company for the stolen electrical power and to pay $500,000, gained as a result of his illegal activities, to the Clallam County Racketeering Fund.

### LEADING ORGANIZED CRIME

To convict a defendant of leading organized crime, the State must prove that the defendant "[i]ntentionally organiz[ed], manag[ed], direct[ed], supervis[ed], or financ[ed] any three or more persons with the intent to engage in a pattern of criminal profiteering activity." RCW 9A.82.060(1)(a). The statute defines pattern of criminal profiteering activity as

> engaging in at least three acts of criminal profiteering . . . . In order to constitute a pattern, the three acts must have the same or similar intent, results, accomplices, principals, victims, or methods of commission, or be otherwise interrelated by distinguishing characteristics including a nexus to the same enterprise, and must not be isolated events.

RCW 9A.82.010(15). Enumerated criminal profiteering acts include delivery or manufacture of controlled substances or possession with intent to deliver or manufacture controlled substances and theft. RCW 9A.82.010(14)(e), (n).

## I
### DOUBLE JEOPARDY

██ Barnes claims that the double jeopardy clauses of the federal and state constitutions prevent a criminal prosecution for the same acts prosecuted under a civil action. But in a recent case, the United States Supreme Court held that generally civil forfeiture is remedial, not punitive, for purposes of double jeopardy analysis. Thus, the State did not violate Barnes's federal constitutional rights by pursuing the criminal action after the dismissal of the civil action. *United States v. Ursery*, 518 U.S. 267, 116 S. Ct. 2135, 2148-49, 135 L. Ed. 2d 549 (1996). We have interpreted the state constitution similarly. *Tellevik v. 6717 100th St. S.W.*, 83 Wn. App. 366, 370-71, 921 P.2d 1088 (1996). Thus, this claim lacks merit.

## II
### COLLATERAL ESTOPPEL

Barnes argues that the trial court erred in denying his motion to dismiss the criminal action on the basis of collateral estoppel. Relying on the fact that he was successful in the earlier civil forfeiture action, Barnes had asked the trial court to bar the criminal prosecution.

██ Collateral estoppel applies only if (1) the issues presented in both cases are identical; (2) there was a final judgment on the merits in the first action; (3) the party against whom the doctrine is asserted was a party to or in privity with a party to the prior action; and (4) application of the doctrine does not work an injustice against the party to whom it is applied. *Rains v. State*, 100 Wn.2d 660, 665, 674 P.2d 165 (1983). The burden of proof is on the party

asserting collateral estoppel. *McDaniels v. Carlson,* 108 Wn.2d 299, 303, 738 P.2d 254 (1987). We conclude that Barnes failed to establish elements (1), (2) and (4).

Regarding element (1), the State conceded identity of issues in its response to Barnes's motion to dismiss. But in its appellate brief, the State suggests that the concession may have been premature because financial gain is an issue peculiar to a civil forfeiture action.

■ The purpose of a civil forfeiture action is to obtain from the defendant financial gains traceable to the criminal profiteering conduct. RCW 9A.82.100(5)(c). This requires proof that the defendant was successful in obtaining gains. The crime of leading organized crime contains, as an element, the doing of acts for financial gain. But to prove the crime, the State need only prove the purpose of the defendant's acts; it need not prove that the defendant was successful in his crime and actually obtained his goal. RCW 9A.82.060(1)(a); RCW 9A.82.010(14). Thus, we agree that the identity of issues prong is not satisfied.

■ ■ To satisfy element (2), the proponent must show that in the earlier litigation there was a final judgment on the merits of the issue at hand. *United States v. Dowling,* 493 U.S. 342, 350, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990); *State v. Kassahun,* 78 Wn. App. 938, 949, 900 P.2d 1109 (1995): *Beagles v. Seattle-First Nat'l Bank,* 25 Wn. App. 925, 932, 610 P.2d 962 (1980); *Roper v. Mabry,* 15 Wn. App. 819, 821, 551 P.2d 1381 (1976), *review denied,* 88 Wn.2d 1001 (1977). The proponent must provide the reviewing court with a sufficient record of the prior litigation to facilitate such analysis. *Beagles,* 25 Wn. App. at 932. Where it is not clear whether an issue was actually litigated, or if the judgment is ambiguous or indefinite, application of collateral estoppel is not proper. *Mead v. Park Place Properties,* 37 Wn. App. 403, 407, 681 P.2d 256, *review denied,* 102 Wn.2d 1010 (1984); *See* 14 Lewis H. Orland & Karl B. Tegland, Washington Practice *Trial Practice* § 368, at 747-48 (5th ed. 1996).

Here, Barnes has not provided us with a record of the summary judgment proceeding.[1] Consequently, we cannot say that the summary judgment court's adjudication of the issue of Barnes's role in leading organized crime was " 'sufficiently firm to be accorded conclusive effect.' " *Cunningham v. State*, 61 Wn. App. 562, 567, 811 P.2d 225 (1991) (quoting RESTATEMENT (SECOND) OF JUDGEMENTS § 13 (1982)).

■ To establish element (3), identity of parties, the proponent must show that "the party *against whom* the plea of collateral estoppel is asserted was a party or in privity with a party in the prior litigation." *State v. Dupard*, 93 Wn.2d 268, 273, 609 P.2d 961 (1980). Here, both the County, in the civil action, and the State, in the criminal action, were represented by the prosecutor who decided whether to bring charges and how to proceed. The County and State both operated under the same state law, relied upon the same search warrant and subsequent search, and could have benefited from an order of forfeiture. Thus, we conclude that the State and County were in privity as they "had a mutual interest and shared a common purpose in a successful prosecution . . . as well as a successful forfeiture of [the defendant's] possessions." *Barlindal v. City of Bonney Lake*, 84 Wn. App. 135, 143, 925 P.2d 1289 (1996).

■■ To analyze element (4)—whether application of the doctrine would work an injustice against the State—we must evaluate competing policy interests. *Dupard*, 93 Wn.2d at 275-76. The judicially created doctrine of collateral estoppel evolved in response to the need to conserve

---

[1]We take judicial notice of an unpublished opinion in our court files affirming the summary judgment. *Clallam County v. Barnes*, 74 Wn. App. 1053 (filed June 20, 1994). RCW 2.06.040. However, as neither party cited or argued this opinion, we decline to consider the discussion contained therein in analyzing the issue before us.

judicial resources and to provide finality for litigants. *Dupard,* 93 Wn.2d at 272. But under the facts here, compelling public policy considerations support the trial court's refusal to apply the doctrine.

The purpose of the criminal code is to protect the community from "conduct that inflicts or threatens substantial harm to individual or public interests." RCW 9A.04.020(1)(a); RCW 9.94A.010(4). It does so, in part, by incarcerating the perpetrator. The community also has an interest in promoting respect for the law by providing just punishment. RCW 9.94A.010(2).

A civil forfeiture action may deter crime, but it cannot halt the defendant's criminal activity by incarcerating him. Nor does it satisfy the public policy of punishing the defendant in proportion to the seriousness of the offense and his criminal history. *See* RCW 9.94A.010(1).

■■ The crime charged here, leading organized crime, RCW 9A.82.060(1), is a class A felony. A serious crime, it includes at least three other persons, requires three predicate crimes, and may involve ongoing criminal activity. The Legislature has demonstrated its particular interest in protecting the public from criminal profiteering by providing, in addition to the usual criminal sanctions, the further extensive remedies set forth in RCW 9A.82.100. The court, too, has noted that a crime involving several participants places a community in "greater peril" than does "criminal activity by one individual." *State v. Smith,* 64 Wn. App. 620, 625, 825 P.2d 741 (1992). As we stated in *Smith,* a criminal enterprise "poses a great[er] challenge to law enforcement" and "the specter of such organized wrongdoing tends to make the general public feel that it is held hostage by the criminal enterprise." *Smith,* 64 Wn. App. at 625-26. We conclude, in light of these considerations, that application of the doctrine would work an injustice against the State. For all

the above reasons, the trial court did not err in denying Barnes's motion to dismiss the criminal complaint.[2]

## III

### STATUTORY PROHIBITION OF TWO ACTIONS

Barnes contends that RCW 9A.82.100(13) precludes the State from bringing a criminal action based on the same acts it prosecuted in an earlier public civil action.[3] That statute provides that a *private* civil action "does not limit any other civil or criminal action." Barnes argues that by negative implication, the statute provides that a *public* civil action does prevent a subsequent criminal action. But his contention is not supported by the statute's legislative history.

▆▆ ▆▆ The fundamental objective of statutory interpretation is "to ascertain and carry out the intent of the Legislature." *Rozner v. City of Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991). Where there is more than one reasonable interpretation, we are obliged to adopt the interpretation most consistent with the context of the entire act. *Cherry v. Municipality of Metro. Seattle*, 116 Wn.2d 794, 800, 808 P.2d 746 (1991); *Southwick, Inc. v. City of Lacey*, 58 Wn. App. 886, 894 n.9, 795 P.2d 712 (1990).

As originally enacted, the statute permitted prosecution

---

[2]The concurrence, while agreeing with our analysis of the collateral estoppel issue as to the criminal prosecution, would bar the State from obtaining those postconviction remedies previously sought in the civil forfeiture action. While this suggestion has arguable merit, we decline to address it because Barnes neither sought this relief in the trial court, assigned error to the trial court's failure to selectively apply collateral estoppel, nor provided argument on this matter in his appellate brief. *See* RAP 12.1; *Babcock v. State*, 116 Wn.2d 596, 606, 809 P.2d 143 (1991); *State v. Hubbard*, 103 Wn.2d 570, 574, 593 P.2d 718 (1985); *State v. Davis*, 41 Wn.2d 535, 250 P.2d 548 (1952).

[3]RCW 9A.82.100(13) provides:

"A private civil action under this section does not limit any other civil or criminal action under this chapter or any other provision. Private civil remedies provided under this section are supplemental and not mutually exclusive."

for both civil and criminal actions.[4] After its passage, there were various attempts to insert a requirement that prosecutors elect between a civil and criminal action.[5] These efforts were defeated. 2 House Journal, State of Wash. 1858 (1985); 2 Senate Journal, State of Wash. 1677 (1985).

Given this history, the interpretation that Barnes urges us to adopt is not well founded. We conclude the more reasonable interpretation is that the Legislature intended to provide prosecutors with the ability to bring both a civil action and a criminal action regardless of the identity of the initiating party in the civil action.

## IV

### PROSECUTORIAL VINDICTIVENESS

Barnes asserts that the trial court erred by refusing to dismiss the charges based upon his allegations of prosecutorial vindictiveness. A trial court is vested with discretion in determining whether to grant a motion to dismiss. *State v. Thorpe*, 51 Wn. App. 582, 588, 754 P.2d 1050, *review denied*, 111 Wn.2d 1012 (1988). A decision that is based upon untenable grounds or reasons or is manifestly unreasonable constitutes an abuse of that discretion. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 77, 684 P.2d 692 (1984).

Barnes points to the successive prosecutions as evidence of vindictiveness. Because we have concluded that RCW 9A.82.100 contemplates both civil and criminal prosecutions, we must reject his argument.

He also claims that the State's "shocking, . . . long-

---

[4]The statute originally provided:

"A civil action under this section is remedial and does not limit any other civil or criminal action under this chapter or any other provision. Civil remedies provided under this section are supplemental and not mutually exclusive."

RCW 9A.82.100(13) (LAWS OF 1984, ch. 270 § 15.)

[5]Excerpts from January, 1985 RICO Task Force Report, at 18, 20-21, provided as Appendix A, Respondent's brief; House Bill 767.

standing and inexplicably malicious vendetta" led to his prosecutions. According to Barnes, the police made threats against him, initiated unjustifiable surveillance by the National Guard and the drug task force, and waged a negative media campaign against him.

The State disputed the allegations and the trial court, after considering the evidence, ·ruled that Barnes had failed to show actual vindictiveness. Nothing in the record indicates that the trial court abused its discretion in making this ruling. Further, Barnes provides no authority for the proposition that the court may presume prosecutorial vindictiveness based upon improper police actions. Without more, we cannot say that the trial court abused its discretion in denying Barnes's motion for dismissal.

## V

### JURY DEADLOCK

Barnes contends that the trial court erred at the first criminal trial by failing to question the jurors regarding whether further deliberations would be productive and by refusing to instruct them further as to the law.

Extraordinary and striking circumstances are required to justify a mistrial. *State v. Kirk*, 64 Wn. App. 788, 793, 828 P.2d 1128, *review denied*, 119 Wn.2d 1025 (1992). A trial judge is accorded broad discretion in making this determination. *Kirk*, 64 Wn. App at 793. A trial judge's belief that the jury is deadlocked is the classic basis for declaring a mistrial. *Arizona v. Washington*, 434 U.S. 497, 509, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978).

In determining whether a jury is deadlocked, the judge may consider the length of jury deliberations relative to the length of the trial and the complexity of issues and evidence. *Kirk*, 64 Wn. App. at 793. In questioning the jury, the court must avoid coercing or interfering with the deliberations and must reject instructions that might coerce an agreement. CrR 6.15(f)(2); *State v. Dykstra*, 33 Wn. App. 648, 652, 656 P.2d 1137, *review denied*, 99 Wn.2d

1014 (1983). Further, the court may rely upon the representations of the presiding juror regarding whether the jury is deadlocked. *Dysktra,* 33 Wn. App. at 652. There are no particular procedures that the court must follow in determining the probability of the jury reaching an agreement. *State v. Boogaard,* 90 Wn.2d 733, 739, 585 P.2d 789 (1978).

Although Barnes argues that several federal cases require the court to question the jury upon being told that it is deadlocked, because of the substantial differences[6] between state and federal court procedure, we need not apply federal case law.

Moreover, despite Barnes's claim that *Kirk* and *State v. Jones,* 97 Wn.2d 159, 641 P.2d 708 (1982) mandate judicial inquiry into claimed deadlock, the cases are distinguishable. In *Kirk,* although the jurors were unable to agree on the greater offense charged, there was no showing of deadlock. *Kirk,* 64 Wn. App. at 790, 793. In *Jones,* the court twice asked whether a verdict would be possible within 90 minutes, not whether one could be reached at all. *Jones,* 97 Wn.2d at 160-61. Further, because the trial court did not explore other alternatives, the appellate court concluded that the trial judge had not established genuine deadlock. *Jones,* 97 Wn. 2d at 160-61.

In contrast, here the jury announced that it was hopelessly deadlocked, not once, but twice. It indicated how it was numerically divided. *See Jones,* 97 Wn.2d at 164. The second note indicated that it understood the instructions and was frustrated over its inability to reach a verdict. Thus, the trial court had reason to believe the jury was truly deadlocked. In exercising its considerable discretion, it was not required to conduct a detailed inquiry. Faced with the finality implied by the two notes, we cannot say that it abused its discretion by declaring a mistrial.

---

[6]These differences include federal judges' ability to comment on the evidence and give the *Allen* instruction as well as the lack of written instructions to federal juries. *Allen v. United States,* 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 2d 528 (1896).

■ Barnes also contends that in this situation, federal case law requires additional instruction. For the reasons previously stated, we are not bound by federal case law. To be sufficient, jury instructions must accurately state the law, permit each side to argue its theory of the case, and not be misleading. *State v. Rice*, 110 Wn.2d 577, 603, 757 P.2d 889 (1988), *cert. denied*, 506 U.S. 958 (1992). The instructions here accomplished that. Consequently, the trial court did not abuse its considerable discretion by refusing to give Barnes's requested additional instruction.

# VI

## ADMISSION OF EVIDENCE

■ Barnes makes several claims of trial court error in admitting evidence. Evidentiary rulings are within the sound discretion of the trial court and a reviewing court will not disturb these rulings absent a showing of abuse of discretion. *State v. Stubsjoen*, 48 Wn. App. 139, 147, 738 P.2d 306, *review denied*, 108 Wn.2d 1033 (1987). Abuse "occurs when the ruling of the trial court is manifestly unreasonable or discretion was exercised on untenable grounds." *State v. Gatalski*, 40 Wn. App. 601, 606, 699 P.2d 804, *review denied*, 104 Wn.2d 1019 (1985); *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 482 P.2d 775 (1971). The defendant bears the burden of proving abuse of discretion. *State v. Hentz*, 32 Wn. App. 186, 190, 647 P.2d 39 (1982), *rev'd on other grounds*, 99 Wn.2d 538, 663 P.2d 476 (1983).

### A. Suppression

### 1. Wentworth/Stansbery House

■ ■ Barnes asserts that the trial court abused its discretion in admitting the evidence gained from the search under warrant of the Wentworth/Stansbery residence. Fourth Amendment rights are personal and cannot be vicariously asserted. *State v. Goucher*, 124 Wn.2d 778, 787, 881 P.2d 210 (1994). Accordingly, Barnes may chal-

lenge a search only if he has a legitimate expectation of privacy in the area searched. *Goucher*, 124 Wn.2d at 787. Lacking a legitimate expectation of privacy in the Wentworth/Stansbery house, Barnes relies on the automatic standing exception to support his assertion.

█ Barnes has automatic standing only if (1) the charged offense includes, as an essential element, the element of possession; and (2) he was in possession of the contraband at the time of the contested search. *Goucher*, 124 Wn.2d at 787; *State v. Zakel*, 119 Wn.2d 563, 568, 834 P.2d 1046 (1992).

But unlike *Goucher* and *Zakel*, Barnes made no claim that he was in possession of the marijuana; in fact, he denied it. Accordingly, he lacks standing to challenge the search of the Wentworth/Stansbery residence and the trial court did not abuse its discretion by admitting the evidence found as a result of the search.

## 2. Barnes's House

Barnes also claims that the warrant to search his residence was not supported by probable cause and was overbroad and that, consequently, the evidence gained from the search should have been suppressed.

█ To establish probable cause, the affidavit must provide facts sufficient for a reasonable person to conclude that the defendant is probably involved in criminal activity. *State v. Cord*, 103 Wn.2d 361, 365-66, 693 P.2d 81 (1985). Affidavits in support of a search warrant are evaluated as a whole, in a commonsense, nonhypertechnical manner. *State v. Fisher*, 96 Wn.2d 962, 965, 639 P.2d 743, *cert. denied*, 457 U.S. 1137 (1982). Doubts concerning the affidavit are resolved in favor of its validity. *State v. Partin*, 88 Wn.2d 899, 904, 567 P.2d 1136 (1977). On review, we accord deference to the magistrate's determination of probable cause. *Cord*, 103 Wn.2d at 366.

█ To obtain a warrant, the State must satisfy the

two-prong *Aguilar/Spinelli* test. *Fisher*, 96 Wn.2d at 965; *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). This test requires a showing (1) of the underlying circumstances from which the informant drew his conclusions and (2) that either the information or the informant is reliable. *Fisher*, 96 Wn.2d at 965; *Aguilar*, 378 U.S. at 114; *Spinelli*, 393 U.S. at 415-16.

Here, Barnes argues that the State failed to satisfy the reliability prong because the affidavits failed to establish that he was involved in the marijuana grow operation. But the affidavits reveal otherwise.

Chute informed police of the marijuana growing operations at the Wentworth/Stansbery and Smith residences, Barnes's role in them, Barnes's plan to expand the operation by building more houses, the power diversion engineered by Madle and the names of others involved in the scheme. He admitted to being a drug addict and explained that Smith was his supplier.

The fruits of the Wentworth/Stansbery search corroborated Chute's information, and a search of Smith's residence at 153 Barnes Road further corroborated Chute's story. At the Smith residence, the police found 70 marijuana plants, phone records indicating phone calls between Smith and Barnes, envelopes addressed to Wentworth and to Barnes, and invoices for the purchase of growing equipment in Wentworth's name.

Thus, the magistrate had evidence of two large-scale marijuana growing operations that confirmed Chute's credibility. As both prongs of the Aguillar/Spinelli test were satisfied, the magistrate properly concluded there was sufficient probable cause to support issuance of the warrant. Consequently, the trial court did not abuse its discretion in admitting the evidence.

Barnes also complains that the warrant was overbroad. It allowed for the search of his residence, garage, outbuildings, vehicles, and curtilage for the following items:

[g]rowing marijuana plants, harvested marijuana, grow lamps, transformers, pots, scales, and all material required for growing, harvesting, packaging and distribution of marijuana. Together with photographs, currency, records, to include records related to the illegal sales, marketing, and/or possession of marijuana, and other material that will establish dominion and control of the residence, and all paraphernalia associated with drug usage and sale and all firearms therefound. All records pertaining to finances, the identification and/or documentation of co-conspirators in what appears to be a continuing criminal enterprise.

Barnes contends that the officers' failure to even attempt to "segregate documents relating to the allegations against [him] from purely personal and unrelated documents" constitutes an unconstitutional general rummaging under *State v. Perrone*, 119 Wn.2d 538, 834 P.2d 611 (1992), and that the directive to seize all records pertaining to finances and co-conspirators in a "continuing criminal enterprise" fails to provide the type of particularized instruction required by the particularity requirement of the constitution.

 The *Perrone* court observed that the required degree of specificity depends upon the circumstances and the type of items involved and that a warrant must allow officers some latitude to ascertain the things they may seize. *Perrone*, 119 Wn.2d at 546. Rules of practicality, necessity and common sense govern the required degree of detail in describing the items to be seized. *State v. Withers*, 8 Wn. App. 123, 126, 504 P.2d 1151 (1972); *accord State v. Reid*, 38 Wn. App. 203, 212, 687 P.2d 861 (approved search for "any other evidence of homicide"), *review denied*, 102 Wn.2d 1025 (1984); *State v. Lingo*, 32 Wn. App. 638, 642, 649 P.2d 130 (approved search for "any and all evidence" of the crimes of assault and rape), *review denied*, 98 Wn.2d 1005 (1982); *State v. Smith*, 16 Wn. App. 425, 428, 558 P.2d 265 (1976) (approved warrant to search for "documents, canceled checks, bank statements, and correspondence pertaining to guardianship accounts"), *review denied*, 88 Wn.2d 1011 (1977).

Here, the nature of the offense, leading organized crime, is broad and the records that are needed to support the allegation are likely to be numerous and general in nature. To prove its allegations that Barnes had income from unidentified sources, the State needed to identify all sources and uses of income. Under these circumstances, the warrant did not violate particularity requirements. Accordingly, the trial court did not abuse its discretion in admitting the fruits of the search of Barnes's house.

## B. Expert's Summary Testimony

Barnes next contends that the trial court erred in permitting William Partin, the State's expert witness, to testify in summary fashion about Barnes's finances. Partin, a certified public accountant and experienced forensic analyst, used over 13,000 documents seized from Barnes's home to construct a database from which he reconstructed Barnes's sources of income and uses of that income from 1987 through the first six months of 1990. Partin then presented the reconstruction to the jury in summary form.

Barnes argues that the summary was not admissible without a showing that the source documents were admissible. *State v. Marshall*, 25 Wn. App. 240, 243, 606 P.2d 278 (1980), *review denied*, 95 Wn.2d 1005 (1981); *State v. Kane*, 23 Wn. App. 107, 110-11, 594 P.2d 1357 (1979). He claims that the 13,000 documents were not shown to be authentic and thus the summary based upon them was irrelevant and inadmissible under ER 901.

But ER 1006 permits summaries of evidence when necessity dictates that it is the only practicable way of presenting the evidence. *Keen v. O'Rourke*, 48 Wn.2d 1, 5, 290 P.2d 976 (1955); 5B KARL TEGLAND, WASH. PRAC., *Evidence* §§ 495, 496 (3d. ed. 1989); *see also Marshall*, 25 Wn. App. 240. The *Marshall* and *Kane* courts also held that summaries are admissible when (1) they promote the jury's convenience and (2) the proponent of the summary establishes that the original records are too voluminous

for easy use in court and makes the records available for examination by the opposing party. *Marshall*, 25 Wn. App. at 243; *Kane*, 23 Wn. App. at 110-11.

Partin testified that to insure accuracy in reconstructing the financial data, he had the State subpoena records from others to verify the transactions[7] and interviewed the relevant individuals. Either the custodian of the record or a party to the transaction could have identified each document. But this would have been very inconvenient for the jury as it would have required innumerable court hours. Further, Barnes's expert witness had the opportunity to examine the documents. Thus, the summary evidence satisfied the requirements of *Marshall, Kane, Keen* and ER 1006. The trial court did not abuse its discretion by permitting the summary testimony.

### C. Admission of Co-conspirator's Testimony

Barnes objects to the admission of hearsay evidence provided by Bennett and Chute. Their testimony related statements by Zimmerman, Smith, and Wentworth. Barnes contends that the State failed to show, with substantial independent evidence, that the statements were made during and in the course of the conspiracy.

 Statements of co-conspirators made during the course of the conspiracy and in furtherance of it are admissible. ER 801(d)(2)(v); *State v. St. Pierre*, 111 Wn.2d 105, 118, 759 P.2d 383 (1988). As a predicate to admission, however, the State must first establish a prima facie case of conspiracy. *St. Pierre*, 111 Wn.2d at 118. A prima facie showing simply requires evidence which supports a "logical and reasonable deduction" that the crime occurred. *State v. Riley*, 121 Wn.2d 22, 32, 846 P.2d 1365 (1993) (quoting *State v. Hamrick*, 19 Wn. App. 417, 419, 576 P.2d 912 (1978)).

---

[7] Items that were subpoenaed included all bank account statements including deposits and canceled checks; copies of leases, sales contracts, deeds, promissory notes, vehicle titles, tax records, invoices and sales receipts.

RCW 9A.28.040(1) states in pertinent part:

> A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

To prove a conspiracy, it is not necessary to show a formal agreement. *State v. Smith*, 65 Wn. App. 468, 471, 828 P.2d 654, *review denied*, 119 Wn.2d 1019 (1992). A conspiracy "may be proven by showing the declarations, acts and conduct of the conspirators." *State v. McGonigle*, 144 Wash. 252, 260, 258 P. 16 (1927) (quoting *State v. Ryan*, 47 Or. 338, 82 P. 703 (1905)). The agreement may be shown by a "concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.' " *State v. Casarez-Gastelum*, 48 Wn. App. 112, 116, 738 P.2d 303 (1987) (quoting *Marino v. United States*, 91 F.2d 691, 694, 113 A.L.R. 975 (9th Cir. 1937), *cert. denied sub nom. Gullo v. United States*, 302 U.S. 764, 58 S. Ct. 410, 82 L. Ed. 2d 593 (1938)). Moreover, circumstantial evidence may provide proof of a conspiracy. *State v. Brown*, 45 Wn. App. 571, 579, 726 P.2d 60 (1986). Once the conspiracy has been established, evidence of a defendant's slight connection to it, if proven beyond a reasonable doubt, is sufficient to convict him of participation in the conspiracy. *Brown*, 45 Wn. App. at 579.

Here, there was evidence independent of Bennett's and Chute's testimony that established the existence of a conspiracy. Barnes was well acquainted with Smith and Wentworth; Wentworth leased and later purchased the 6200-B Wye Road house from Barnes; Barnes contracted with Zimmerman to have the house built and supervised its construction; Barnes owned the home when the power diversion was installed by Madle; after Smith was evicted, Barnes remained in contact with him; Barnes had over $500,000 in unreported income from 1987 through 1990; and phone records indicate numerous calls between Wentworth, Smith, Barnes and Madle. This evidence is suf-

ficient to permit a logical and reasonable deduction that a conspiracy existed involving Barnes.

There also was evidence that Barnes furthered the conspiracy. Bennett testified that he became suspicious that there was an illegal marijuana growing operation and that Barnes, through Zimmerman, threatened him if he repeated his suspicions to anyone. This furthered the conspiracy by permitting the growing operation to continue. Likewise, Chute's testimony that Barnes, Wentworth, and Smith discussed plans to continue the growing operation at 6200-B Wye Road house and to build others like it demonstrates actions in furtherance of the conspiracy.

Thus, the trial court had independent evidence of the conspiracy and of acts in furtherance of it. Accordingly, the trial court did not abuse its discretion by permitting Bennett and Chute to testify about Barnes's role in the conspiracy.

## IX

### PREDICATE ACTS

Barnes contends that the trial court erred in denying his motion to dismiss the count of leading organized crime because the jury failed to find that he acted with at least one other person to commit each of the three predicate acts. Specifically, he argues that because predicate act eight, possession with intent to deliver marijuana, involved only him, it fails to qualify as a predicate act. He contends that the two remaining predicate acts are insufficient to prove leading organized crime.

RCW 9A.82.060 requires a showing that the defendant intentionally organized, managed, directed, supervised, or financed any three or more persons with the intent to engage in a pattern of criminal profiteering activity. RCW 9A.82.010(15) defines "pattern of criminal profiteering activity" as "engaging in at least three acts of criminal profiteering."

The reference to leading three or more persons is

not linked conjunctively to the commission of the three predicate acts. In other words, the defendant must lead three persons as Barnes did here. And the defendant must intend to commit three acts of criminal profiteering as Barnes did here. But there is no requirement that any of those three people actually engage in any of the charged acts of criminal profiteering. The defendant may engage in some of the activities with others and perform others alone. Consequently, the trial court did not err in denying Barnes's motion to dismiss.

## X

### PATTERN OF CRIMINAL PROFITEERING

Barnes claims the evidence was insufficient to prove that he engaged in a pattern of criminal profiteering— three interrelated acts with a nexus to the enterprise. He argues that the three predicate acts that the jury relied upon to find him guilty all arose out of a single marijuana grow and, thus, do not satisfy the statutory requirements of three separate acts.

Due process requires that the State prove each element of the crime beyond a reasonable doubt. *State v. Aver*, 109 Wn.2d 303, 310, 745 P.2d 479 (1987). Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it is enough to permit any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Scoby*, 117 Wn.2d 55, 61, 810 P.2d 1358, 815 P.2d 1362 (1991). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn from it. *State v. Sanchez*, 60 Wn. App. 687, 693, 806 P.2d 782 (1991). Circumstantial evidence is considered equally as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Credibility determinations are for the trier of fact and are not subject to review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Because only four appellate cases have interpreted

the Washington statute,[8] Barnes suggests we look to cases interpreting the federal racketeering statute. Although there are significant differences between the state and federal statutes, they both require a pattern of criminal activity. Thus, federal case law on this issue provides some assistance. But contrary to Barnes's contention, application of federal case law suggests that the evidence here is sufficient to prove a pattern of criminal profiteering.

 Under federal law, to establish the pattern, the government must show both relationship and continuity, i.e., the predicate acts must both be related and either constitute or threaten long-term criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 236-37, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989); *see also Menasco, Inc. v. Wasserman*, 886 F.2d 681 (4th Cir. 1989); *Medallion Television Enters., Inc. v. SelecTV of California, Inc.*, 833 F.2d 1360 (9th Cir. 1987), *cert. denied*, 492 U.S. 917 (1989). The government established such a pattern by proving that the defendant aided and abetted the importation of a *single* load of marijuana aboard an aircraft and then aided and abetted possession of the *same load* of marijuana. *United States v. Hobson*, 893 F.2d 1267 (11th Cir.), *cert. denied*, 498 U.S. 957 (1990). The *Hobson* court concluded that the acts did not "involve merely a single isolated act of paying money but rather a series of acts, including a demand for repayment of a large sum of money or delivery of marijuana to replace the load lost on the Constellation [the aircraft], which 'by its nature project[ed] into the future with a threat of repetition.'" *Hobson*, 893 F.2d at 1269 (quoting *H.J. Inc.*, 109 S. Ct. at 2902).

 RCW 9A.82.060 requires similar linkage. The evi-

---

[8]*State v. Johnson*, 124 Wn.2d 57, 873 P.2d 514 (1994), and its appellate antecedent, 69 Wn. App. 528, 849 P.2d 662 (1993), *aff'd*, 124 Wn.2d 57, 873 P.2d 514 (1994); *State v. Casey*, 81 Wn. App. 524, 915 P.2d 587, *review denied*, 130 Wn.2d 1009 (1996); *State v. Strohm*, 75 Wn. App. 301, 879 P.2d 962 (1994), *review denied*, 126 Wn.2d 1002 (1995); *State v. Moore*, 73 Wn. App. 789, 871 P.2d 642 (1994). None of these cases deals with the specific issue argued in the instant case.

dence here meets this test. The State proved a complex scheme that involved a power diversion to forestall detection, sophisticated air cleaning and ventilation systems, numerous operational halide lights, a closed circuit TV monitoring system, and a concealed entrance. This was not, as Barnes contends, merely a harvest of a single crop of marijuana. As in *Hobson*, the evidence of a 255-plant, 15-halide-light growing operation capable of producing nearly 16 pounds of marijuana every three months, by its very nature, threatens future repetition. Accordingly, the evidence was sufficient to prove a pattern of criminal profiteering activity.

## XI

### INCONSISTENT VERDICT

Barnes claims that the jury's special verdicts were inconsistent with its general verdict. But he did not make this objection before the court discharged the jury and, thus, has waived his right to object on appeal. *Gjerde v. Fritzsche*, 55 Wn. App. 387, 393, 777 P.2d 1072 (1989), *review denied*, 113 Wn.2d 1038 (1990). "Proper respect for the jury verdict and for the court's responsibility to manage its caseload fairly and expeditiously militate against" permitting a defendant to "try his luck with a second jury." *Gjerde*, 55 Wn. App. at 394 (quoting *Strauss v. Stratojac Corp.*, 810 F.2d 679, 683 (7th Cir. 1987)).

## XII

### JUROR MISCONDUCT

Barnes claims that juror Richert concealed information during voir dire and violated the court's travel restrictions. He contends that this conduct deprived him of a fair trial and, thus, we must vacate his conviction and remand the matter for a new trial.

Barnes bears the burden of showing that the alleged misconduct occurred. *State v. Hawkins*, 72 Wn.2d

565, 566, 434 P.2d 584 (1967). The determination of whether misconduct has occurred lies within the discretion of the trial court. *State v. Havens*, 70 Wn. App. 251, 255-56, 852 P.2d 1120, *review denied*, 122 Wn.2d 1023 (1993). A trial court abuses its discretion when it exercises it on untenable grounds or its ruling is manifestly unreasonable. *Gatalski*, 40 Wn. App. at 606; *Carroll*, 79 Wn.2d at 26. Barnes bears the burden of proving abuse of discretion. *Hentz*, 32 Wn. App. at 190.

Not all instances of juror misconduct merit a new trial; there must be prejudice. *State v. Tigano*, 63 Wn. App. 336, 341, 818 P.2d 1369 (1991), *review denied*, 118 Wn.2d 1021 (1992). We determine prejudice by asking whether the withheld or extraneous information could have affected the jury's deliberations. *Tigano*, 63 Wn. App. at 341.

Barnes claims that Richert did not truthfully answer the question as to whether he knew the defendant. Because juror Richert was in Barnes's high school class and because there were only 11 students in the class, Barnes contends that Richert should have remembered him. But Richert testified that he did not remember Barnes from high school, many years ago. As the trial judge concluded that Richert had testified truthfully, there is no basis for us to hold that the trial court abused its discretion in reaching its decision.

Barnes also produced two individuals who testified that they had seen Richert in an area that the trial judge had warned was off limits. Richert denied the allegations, pointing out that each had a reason to assist Barnes. Additionally, Richert and his wife testified that although they had been in the restricted area at the specific locations described by Barnes's witnesses, it was not during the trial.

The trial court was not fully satisfied with Richert's story, but nevertheless concluded that Barnes had failed to demonstrate any prejudice from the alleged violation. In assessing prejudice, the particular misconduct must be compared with all of the facts and circumstances of the

trial. *Tigano*, 63 Wn. App. at 342. The trial judge is, therefore, in the best position to make this determination. *Tigano*, 63 Wn. App. at 342.

Consequently, we cannot say that the trial court did abuse its discretion in refusing to vacate Barnes's conviction and remand his case for a new trial.

## XIII

### $500,000 RECOUPMENT

▆▆▆ Finally, Barnes claims that the trial court was without authority to assess the $500,000 recoupment. He argues that, as RCW 9A.82.100 is not part of the criminal code but instead sets forth a civil cause of action, there is no authority for its use in a criminal case. But RCW 9A.82.090 provides that "[u]pon conviction of a person for a violation of RCW 9A.82.060 . . . , the superior court may, in addition to its other powers of disposition, issue an order pursuant to RCW 9A.82.100." And RCW 9A.82.100(4)(g) permits the trial court to order payment to the appropriate state or county fund in "an amount equal to the gain a person has acquired or maintained through an offense included in the definition of criminal profiteering."

Finally, Barnes challenges the sufficiency of the evidence to support the $500,000 fine amount. Partin's trial testimony, however, was sufficient to prove by a preponderance of the evidence that Barnes acquired $500,000 by engaging in the three proven predicate acts. *See* RCW 9A.82.100(9). Thus, the trial court did not err in requiring the fine.

We affirm.

ARMSTRONG, J., concurs.

TURNER, J. Pro Tem. (concurring) — The majority points out that, in the forfeiture action, the State needed to prove that defendant obtained traceable financial gains; but, in

the criminal action, it needed to prove only that defendant meant to obtain such gains, not that he actually obtained them. All other issues were identical. But because of the extra issue in the forfeiture action, the majority holds that collateral estoppel does not apply to the other issues, which were identical in the two actions. I disagree. All issues need not be identical for collateral estoppel to apply to those issues that are identical: "Where res judicata precludes relitigation of an entire cause because of an identity of parties and issues culminating in a judgment, collateral estoppel is less inclusive, preventing retrial of but one or more of the crucial issues or determinative facts." *Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 396, 429 P.2d 207 (1967).

Furthermore, there is no injustice in limiting the State to one forfeiture action; collateral estoppel should apply to at least bar postconviction assessment of the criminal penalties that were previously sought in failed civil forfeiture proceedings.[9]

After modification, further reconsideration denied April 18, 1997.

Review denied at 133 Wn.2d 1021 (1997).

---

[9]But Barnes did not ask the trial court to selectively apply collateral estoppel; nor did he assign error to its failure to do so or provide argument on the matter in his appellate brief. Further, Barnes did not provide us with a record of the summary judgment proceeding, thus creating an ambiguity as to which issues were actually litigated. For these reasons I concur with the majority rather than dissent.