IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32708-6-III |
| Respondent, | ) | (consolidated with |
| | ) | No. 32760-4-III) |
| v. | ) | |
| | ) | |
| THOMAS LEE WEATHERWAX, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| | ) | OPINION PUBLISHED |
| STATE OF WASHINGTON, | ) | IN PART |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAYME LEE RODGERS, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — In this consolidated appeal, Thomas Weatherwax and Jayme

Rodgers both challenge their convictions of three counts of drive-by shooting and the

sentences imposed for their convictions of three counts of first degree assault. Both

challenge conditions of community custody. Mr. Weatherwax alone challenges one of

No. 32708-6-III (consol. w/ No. 32760-4-III)
*State v. Weatherwax*

his convictions for first degree assault and Mr. Rodgers alone challenges legal financial obligations (LFOs) imposed by the court. Each has filed a statement of additional grounds (SAG).

In the published portion of this opinion, we construe RCW 9.94A.589(1)(b) to determine how it should be applied where one of the serious violent offences being sentenced is an anticipatory offense. We reach a different conclusion than was reached by Division One of our court in *State v. Breaux*, 167 Wn. App. 166, 273 P.3d 447 (2012). We also identify respects in which gang-related community custody conditions imposed by the trial court are unconstitutionally vague and must be stricken or narrowed on resentencing.

In the unpublished portion of this opinion, we hold that insufficient evidence supports the drive-by shooting convictions, since the State failed to demonstrate shots were fired from, or from the immediate area of, Mr. Rodger's car. And the State concedes that mandatory minimum sentences for the assault convictions were imposed in error, a concession we accept. We also hold that motor vehicle related community custody conditions must be stricken on resentencing.

All of the remaining convictions are supported by substantial evidence and neither SAG identifies any trial court error or abuse of discretion. We reverse the drive-by shooting convictions and the mandatory minimum sentences, and remand for resentencing consistent with this opinion.

2

FACTS AND PROCEDURAL BACKGROUND

Late one evening in September 2013, Leroy Bercier was at a convenience store in the Hillyard neighborhood of Spokane, when he was accosted by Jayme Lee Rodgers, a member of the Norteño Red Boyz gang, which claims Hillyard as its territory. Mr. Bercier's shoes, belt, and shirt were all blue, a color favored by the Sureños, the rival gang of the Norteño Red Boyz. Mr. Rodgers confronted Mr. Bercier about his blue clothing and called him a "scrap"—a derogatory term for a Sureños gang member. Mr. Bercier's cousin broke up the confrontation and one of the store's owners, Surgit Singh, asked Mr. Rodgers to leave.

Mr. Rodgers left the store and joined his passenger and fellow Norteño Red Boyz member, Thomas Weatherwax, in Mr. Rodgers's car. They remained in the convenience store parking lot for a time, unsuccessfully calling to Mr. Bercier to come out and fight. Eventually, Mr. Rodgers and Mr. Weatherwax drove away.

Shortly thereafter, Louie Stromberg and Amanda Smith arrived at and entered the convenience store. Mr. Bercier, who denied being a member of the Sureños gang but had family members who were, told Mr. Stromberg he was worried about two people outside who were going to "jump him." Report of Proceedings (RP) at 229. According to Mr. Stromberg, Mr. Bercier appeared very frightened; Mr. Stromberg looked outside for him,

3

but did not see anyone. He told Mr. Bercier he would watch out and make sure nobody hurt him.

Mr. Bercier then left the store in the direction of two semitrucks parked in a large dirt lot next to the convenience store. Moments later, he came running back, passing Mr. Stromberg, who had completed his purchase and returned to his car.

Mr. Bercier's race back to the store caused Mr. Stromberg to step out of his car, after which he saw two figures come around the semitrucks, which were about 30 yards away. Without coming any closer, the two began shooting in the direction of Mr. Stromberg's car. They fired six to ten shots, three of which hit Mr. Stromberg's car. Like Mr. Stromberg, Ms. Smith was standing outside the car when the shots were fired. Both Mr. Stromberg and Ms. Smith ran into the store for cover. Mr. Stromberg later testified there were two shooters; he had seen distinct muzzle flashes from two locations.

Police officers located Mr. Rodgers's car that night, parked on the street within a few minutes' driving distance from the convenience store. From running the car's license plate, they determined it had ties to the Norteño Red Boyz gang. The car was parked a block away from the home of a friend of Mr. Weatherwax. Both Mr. Weatherwax and Mr. Rodgers were in the home and were detained by police within several hours of the car being identified.

Officers executed warrants to search the car and the home, and recovered two firearms: a .380 caliber semiautomatic Browning pistol, found in the car's trunk, and a

4

holstered Makarov semiautomatic 9 millimeter pistol, which was found in a dryer inside the home. Forensic testing tied Mr. Weatherwax to the Makarov's holster and tied a bullet from Mr. Stromberg's car to the Browning pistol.

Mr. Rodgers and Mr. Weatherwax were each charged with three counts of first degree assault, with Mr. Bercier, Mr. Stromberg, and Ms. Smith the victims; one count of conspiracy to commit assault against Mr. Bercier; and three counts of drive-by shooting, again with Mr. Bercier, Mr. Stromberg, and Ms. Smith as the victims. Both informations alleged firearm enhancements for the assault and conspiracy to commit assault charges, and a gang aggravator in connection with the crimes committed against Mr. Bercier. Mr. Weatherwax was charged with one count of felon in possession of a firearm.

The men were jointly tried and the jury found both guilty of all charges. Mr. Weatherwax, who had a prior criminal history, was sentenced to 810 months of confinement. Mr. Rodgers, who had no criminal history, was sentenced to 546 months of confinement. The court imposed conditions of community custody on each defendant. Finally, the court imposed mandatory LFOs in the amount of $800 against both Mr. Weatherwax and Mr. Rodgers without objection from either defendant.

Both defendants appeal.

## ANALYSIS

Mr. Weatherwax and Mr. Rodgers raise similar challenges to (1) the proper application of RCW 9.94A.589, (2) community custody conditions imposed, (3) the

5

sufficiency of the evidence to support the drive-by shooting convictions, and (4)

mandatory minimum sentences imposed for assault. Mr. Weatherwax alone challenges

the sufficiency of evidence to convict him of first degree assault of Mr. Bercier. Mr.

Rogers alone challenges the court's imposition of LFOs.

We address the issues in the order stated.

## I. *Sentencing errors: RCW 9.94A.589 and gang-related community custody conditions*

### A. RCW 9.94A.589 and the rule of lenity

Mr. Weatherwax and Mr. Rodgers argue the trial court improperly calculated their

sentences under RCW 9.94A.589 when it applied an offender score of zero to their

convictions for conspiracy to commit first degree assault, rather than to their convictions

for first degree assault. They argue that RCW 9.94A.589 is ambiguous as to how the

offender score is calculated when an offender's current serious violent offenses include

an anticipatory offense. They contend the rule of lenity requires us to resolve that

ambiguity in favor of a calculation method that results in a shorter, rather than longer,

total period of incarceration. Their argument is supported by Division One's decision in

*Breaux*, but we do not believe RCW 9.94A.589 is ambiguous. Plainly read, it supports

the trial court's calculation of the sentence.

Under RCW 9.94A.589(1), sentences for offenses that are serious violent offenses

run consecutively, while sentences for offenses that are not serious violent offenses run concurrently. The statute ameliorates, somewhat, the impact of consecutively sentencing serious violent offenses by providing that the standard range for only one of the serious violent offenses is determined using an offender score that includes all of the offender's prior convictions and current offenses that are not serious violent offenses. The standard range for other serious violent offenses is determined using an offender score of zero. The statute explicitly provides that the offense that is sentenced using the full offender score is the offense with the "highest seriousness level under RCW 9.94A.515." RCW 9.94A.589(1)(b). The result—rational, and presumably intended—is that the full offender score is used where it will maximize the offender's total sentence.

Here, as in *Breaux*, one of the serious violent offenses being sentenced is an anticipatory offense—in this case, it is the charge of conspiracy to commit first degree assault; in *Breaux* the charge was attempted first degree rape. 167 Wn. App. at 168. RCW 9.94A.515, which identifies crimes included within each seriousness level, does not include anticipatory crimes within *any* seriousness level. A different statute, RCW 9.94A.595 provides that for persons convicted of the anticipatory offenses of criminal attempt, solicitation or conspiracy under chapter 9A.28 RCW,

> the presumptive sentence is determined by locating the sentencing grid sentence range defined by the appropriate offender score and the seriousness level of the crime, and multiplying the range by 75 percent.

7

Mr. Weatherwax and Mr. Rodgers argue that if we treat the anticipatory crime of

conspiracy to commit first degree assault *as if* it has a seriousness level of 12 under RCW

9.94A.515—the seriousness level for first degree assault—then neither it nor the first

degree assault count will have the "highest" seriousness level under that statute because

their seriousness levels will be the same. Since the standard sentence range for

conspiracy is reduced by multiplying it by 75 percent, however, the offender derives a

substantial benefit if the offense sentenced using the full offender score is the anticipatory

offense. Mr. Weatherwax and Mr. Rodgers argue the rule of lenity requires us to

construe the statute to give them that benefit. If we do, then we will have created the

only situation in which RCW 9.94A.589(1)(b) does not require the full offender score to

be used where it will maximize the sentence. No reason is offered as to why the

legislature would have intended such a result.

A court's fundamental objective in interpreting a statute is to ascertain and carry

out the legislature's intent. *Arborwood Idaho, LLC v. City of Kennewick*, 151 Wn.2d

359, 367, 89 P.3d 217 (2004). If the statute's meaning is plain on its face, the court must

give effect to that plain meaning as an expression of legislative intent. *Dep't of Ecology

v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). We do not read the

plain language of RCW 9.94A.589(1)(b) as supporting the construction urged by Mr.

Weatherwax and Mr. Rodgers.

8

The statute plainly states the offense that is to be sentenced using the full offender score is "the offense with the highest seriousness level under RCW 9.94A.515." Conspiracy to commit first degree assault has no seriousness level under RCW 9.94A.515. A different statute *treats* it as having a seriousness level and then reduces the resulting standard range. But RCW 9.94A.589(1)(b) does not say that the offense to be sentenced using the full offender score is "the offense with the highest seriousness level under RCW 9.94A.515 *or the highest deemed seriousness level when applying RCW 9.94A.595.*"

We do not read into statutes words the legislature is alleged to have inadvertently omitted unless doing so is imperatively required to make the statute rational. *State v. Taylor*, 97 Wn.2d 724, 728-29, 649 P.2d 633 (1982). And where a party argues that there has been a legislative omission but we can postulate why the legislature might have intended the literal meaning of the statute, our Supreme Court has "uniformly concluded judicial intervention was unwarranted." *Id.* at 729. We can postulate why the legislature might intend a literal meaning in this case: limiting the choice of "the offense with the highest seriousness level under RCW 9.94A.515" to those that actually *have* a seriousness level under that statute, ensures that the full offender score is used where it will maximize the sentence. It avoids an anomalous exception for anticipatory offenses.

For these reasons, we respectfully disagree with the result in *Breaux* and affirm the trial court's application of RCW 9.94A.589(1)(b).

9

B.  Gang-related conditions

Mr. Weatherwax and Mr. Rodgers both challenge the following gang-related condition of community custody that appears in both of their felony judgment and sentences:

> That the defendant shall not wear clothing, insignia, medallions, etc., which are indicative of gang lifestyle.  Furthermore, that the defendant shall not obtain any new or additional tattoos indicative of gang lifestyle.

Clerk's Papers (CP) at 338, 743.  They contend the condition is unconstitutionally vague and impinges on their United States Constitution First Amendment rights.  Mr. Weatherwax, alone, argues the condition must be stricken for the further reason that it is not crime-related.

Mr. Rodgers, alone, challenges a second gang-related condition, "That the defendant not be allowed to have any association or contact with known felons or gang members or their associates."  CP at 743.  The court (or the State on presentment) struck out preprinted language following that condition, which states, "A specific list will be provided to the defendant by [the Department of Corrections] and updated as required by the assigned Community Corrections Officer."  *Id.*

Because we are remanding for resentencing, we will forego discussion of the types of challenges to supervision conditions that can be raised for the first time on appeal and the requirement of ripeness.  We proceed directly to the fact that, in their current form,

these gang-related conditions are unconstitutionally vague and must be stricken, clarified, or narrowed at resentencing.

As an initial matter, we reject Mr. Rodgers's contention that gang-related conditions are not crime-related. The record supports a determination by the sentencing court that future gang-related conduct by Mr. Rodgers would have a direct relation to the circumstances of the crimes of which he remains convicted.[1]

"[T]he due process vagueness doctrine under the Fourteenth Amendment and article I, section 3 of the state constitution requires that citizens have fair warning of proscribed conduct." *State v. Bahl*, 164 Wn.2d 739, 752, 193 P.3d 678 (2008). The doctrine applies to protect against "arbitrary enforcement" of laws and "assure[] that ordinary people can understand what is and is not allowed." *State v. Valencia*, 169 Wn.2d 782, 791, 239 P.3d 1059 (2010) (citing *Bahl*, 164 Wn.2d at 752). When a condition of community placement concerns material protected under the First Amendment, "a vague standard can cause a chilling effect on the exercise of sensitive First Amendment freedoms. For this reason, courts have held that a stricter standard of definiteness applies if material protected by the First Amendment falls within the prohibition." *Bahl*, 164 Wn.2d at 753 (citations omitted).

---

[1] The jury even returned a special verdict finding that the crimes against Mr. Bercier were gang-related, although the court declined to impose an exceptional sentence based on the gang aggravator.

11

*Clothing, insignias, medallions, etc.; and tattoos.* In *State v. Villano*, 166 Wn. App. 142, 272 P.3d 255 (2012), this court concluded that a condition imposed by a juvenile court which forbad the defendant from possessing "gang paraphernalia" was unconstitutionally vague. The court noted that "[i]n the common experience[ of this court, popular clothing items or specific colored items are frequently described as gang attire. If the trial court intended to prohibit the wearing of bandanas or particular colored shoes, it needed to provide clear notice." *Villano*, 166 Wn. App. at 144.

In *Untied States v. Soltero*, 510 F.3d 858 (9th Cir. 2007), the Ninth Circuit Court of Appeals examined the constitutionality of a condition forbidding a defendant to "wear, display, use or possess any insignia, emblem, button, badge, cap, hat, scarf, bandana, jewelry, paraphernalia, or any article of clothing which may connote affiliation with, or membership in the Delhi gang." 510 F.3d at 865. There, the court concluded that the condition was "not impermissibly vague because [it] specifically reference[d] the 'Delhi gang,' and the district court [was] entitled to presume that [the defendant]—who [had] admitted to being a member of this gang—[was] familiar with the Delhi gang's members, its places of gathering, and its paraphernalia." *Id.* at 866.

Where no gang was identified, the Second Circuit Court of Appeals concluded that a condition of supervised release prohibiting the defendant from "wearing of colors, insignia, or obtaining tattoos or burn marks (including branding and scars) relative to [criminal street] gangs," was unconstitutionally vague. *United States v. Green*, 618 F.3d

12

120, 124 (2d Cir. 2010) (alteration in original). There, the court noted that "[t]he range of possible gang colors is vast and indeterminate," and "[e]liminating such a broad swath of clothing colors would make [the offender's] daily choice of dress fraught with potential illegality." *Id.*

The language, "indicative of gang lifestyle" is unconstitutionally vague. It does not limit the prohibited clothing or tattoos to those that are associated with or signify gang membership, nor does it identify the gang or gangs of concern. Some may take the position that *any* tattoo is "indicative of gang lifestyle."[2] On remand, any gang-related conditions prohibiting clothing, insignias, medallions, or tattoos must provide clearer notice of what is prohibited.

*Association with felons and gang members.* In *Soltero*, the court considered the constitutionality of a condition which read:

> The defendant shall not associate with any known member of any criminal street gang or disruptive group as directed by the Probation Officer, specifically, any known member of the Delhi street gang.

---

[2] The State has called our attention to California decisions approving probation conditions that imposed blanket restrictions on tattoos, but those decisions dealt exclusively with juveniles. Under California law, "[e]very person who tattoos or offers to tattoo a person under the age of 18 years is guilty of a misdemeanor." CAL. PENAL CODE § 653. "[T]he probation condition prohibiting [a juvenile defendant] from acquiring additional tattoos and body markings is analogous to the probation condition requiring him to obey all laws." *In re Antonio C.*, 83 Cal. App. 4th 1029, 1035, 100 Cal. Rptr. 2d 218 (2000). Mr. Weatherwax and Mr. Rodgers were both in their twenties at the time they were sentenced.

13

510 F.3d at 865. It held that the portion of the condition which prohibited the defendant from associating "with any known member of any criminal street gang . . . specifically, any known member of the Delhi street gang" was constitutional. *Id.* The identification of the "Delhi street gang," was key in insulating the condition from a vagueness challenge.

The condition was held to be impermissibly vague in prohibiting the defendant from associating with "any known member of any . . . disruptive group." *Id.* at 867 (alteration in original). The court concluded that "disruptive group" could reasonably be interpreted to include groups the government cannot reasonably restrict a defendant from associating with, such as political protesters, labor unions, or sports fans.

In *United States v. Johnson*, 626 F.3d 1085 (9th Cir. 2010), the Ninth Circuit struck down the following condition of supervised release as vague:

> The defendant may not associate with anyone known to him to be a Rollin' 30 gang member or persons associated with the Rollin' 30's gang, with the exception of his family members.

626 F.3d at 1090. The court held that "[t]here is a considerable difference . . . between forbidding a defendant from associating with gang members and precluding him from associating with *persons who associate with* gang members." *Id.* at 1091. Such a condition

> sweeps too broadly because it encompasses not only those who are involved in the gang's criminal activities, but also those who may have only a social connection to an individual gang member. The provision

14

> could forbid [the defendant] from associating with, for example, the . . . employer, minister or friend of a Rollin' 30's gang member. It could even preclude [the defendant] from meeting with his probation officer.

*Id.* The court concluded that the condition was "impermissibly vague and entails a deprivation of liberty that is greater than necessary to achieve the goal of preventing [the defendant] from reverting to his previous criminal lifestyle." *Id.*

The challenged condition here—that "the defendant not be allowed to have any association or contact with known felons or gang members *or their associates*"—suffers from the same infirmity as the condition stricken in *Johnson*, unless it is clear that the word "associates" is intended to have the means provided by RCW 9.94A.030(13).[3] CP at 337, 743 (emphasis added).

To summarize, gang-related conditions of community custody can be imposed as crime-related, given the circumstances of the crimes. But they must be limited to behaviors that signify gang membership or association in or with an identified gang or gangs. Limits on association must be confined to felons, gang members or gang associates in the sense defined by RCW 9.94A.030(13), or to other specifically described persons having a direct relation to the circumstances of the crimes.

---

[3] "'Criminal street gang associate or member' means any person who actively participates in any criminal street gang and who intentionally promotes, furthers, or assists in any criminal act by the criminal street gang." RCW 9.94A.030(13).

15

For reasons discussed hereafter, we reverse the drive-by shooting convictions and the mandatory minimum sentences, and remand for resentencing.

A majority of the panel having determined that only the forgoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

## *II. Evidence sufficiency: drive-by shooting*

Mr. Weatherwax and Mr. Rodgers challenge the sufficiency of evidence to support the drive-by shooting convictions, arguing the State failed to prove shots were fired from, or near, a car that transported them to the location of the shooting.

In order to convict a defendant, each element of the charged crime must be supported by sufficient evidence. *State v. Oakley*, 158 Wn. App. 544, 549, 242 P.3d 886 (2010). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficient evidence admits the truth of the State's evidence as well as the truth of all inferences reasonably drawn therefrom. *Id.*

A defendant is guilty of the crime of drive-by shooting when he or she recklessly discharges a firearm in a manner which creates a substantial risk of death or serious physical injury to another person

16

and the discharge is either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm, or both, to the scene of the discharge.

RCW 9A.36.045(1).

Convenience store owner Surjit Singh was asked if he saw where Mr. Rodgers and Mr. Weatherwax "left and drove away," and answered, "They drove to center—you know, the center—on center of street." RP at 266. The State argues this testimony is sufficient evidence that Mr. Weatherwax and Mr. Rodgers "parked their vehicle in the median of the street next to the gas pumps," and thereby within the immediate area of the shooting. Br. of Resp't (Weatherwax) at 13; Br. of Resp't (Rodgers) at 13. Yet maps entered into evidence do not depict any such median. They *do* depict the cross street on which the convenience store is located as "Central," which might have been what Mr. Singh, who struggled a bit with his English, was attempting to describe. Exs. P-79, P-80.

The prosecutor himself implied that shots were not fired from the immediate area of Mr. Rodgers's car. He argued in closing that after initially driving away, the two defendants returned, and:

> *They parked the car somewhere off in the dark streets*, come back through the dark, hidden behind those [semitrucks], to ambush Mr. Bercier; to catch him out.

RP at 706 (emphasis added). The evidence the prosecutor argued offered support for shots being fired from the "immediate area" of the car was not direct evidence:

17

> So how do you know the motor vehicle was in the immediate area? Well, you know that Mr. Rodgers drove it there to buy gas. You heard some of the witnesses saw it there, the old—the beater car, I think one of them described it as. You know he drove away in it, around the corner, into the dark. *And you know it only took them a few minutes to get from the convenience store over to where the car was parked and surveilled by Officer Shane Oien.*
> *Well, I will suggest to you all of that allows you to, again, infer as circumstantial evidence that the vehicle was in the immediate area.* And that is all that is required.

RP at 710 (emphasis added).

In *State v. Rodgers*, 146 Wn.2d 55, 57-58, 43 P.3d 1 (2002), a third party drove the defendants to an area of town where the defendants got out, walked two blocks, and then intentionally shot at the victim's home. They then ran back to the where their driver was still waiting, and were driven away. At issue on appeal in *Rodgers*, as here, was whether the defendants had discharged a firearm from the "immediate area" of a motor vehicle as required by RCW 9A.36.045. *Id.* at 58.

The court accorded "immediate" its dictionary definition: "'existing without intervening space or substance . . . being near at hand: not far apart or distant.'" 146 Wn.2d at 62 (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1129 (1986)). It found the dictionary definition to advance the legislative intent:

> In our view, the legislature aimed this relatively new statute at individuals who discharge firearms from or within close proximity of a vehicle.

18

> Undoubtedly, it was concerned that reckless discharge of a firearm from a
> vehicle or in close proximity to it presents a threat to the safety of the
> public that is not adequately addressed by other statutes.

*Id.* (footnotes omitted). Giving "immediate area" its usual meaning, the court held it "obvious that one is not in the immediate area of a vehicle that is parked two blocks away from the place where that person discharges a firearm." *Id.*

Unlike *Rodgers*, the evidence in this case does not establish that Mr. Rodgers's car was parked blocks away, but there is insufficient evidence to establish that it was in the "immediate area" of the shooting. Mr. Singh's testimony does not support the State's inference that the car was parked next to a nearby median. According to all of the testimony, Mr. Weatherwax and Mr. Rodgers were on foot and were first observed walking out from behind some semitrucks. Given the inexact evidence of when Mr. Rodgers's car arrived at the home where he was later arrested and the short distances involved, the circumstantial evidence urged by the State in closing argument is consistent with Mr. Rodgers's car being parked several blocks away from where the shots were fired.

Mr. Weatherwax's and Mr. Rodgers's convictions for drive-by shooting are reversed. The reversal of the drive-by shooting convictions will also reduce the offender score used in calculating the men's sentences for first degree assault.

19

### *III. Evidence sufficiency: assault*

Mr. Weatherwax alone challenges the sufficiency of the evidence to support the jury's verdict that Mr. Bercier was the victim of first degree assault. He points out that the evidence established Mr. Bercier was inside the convenience store before shots were fired and argues that Mr. Stromberg and his car, rather than Mr. Bercier, appeared to be the defendants' target.

Mr. Bercier was a reluctant witness at trial; he initially refused to answer any questions, claiming he didn't want any "retaliations . . . [o]n me or my family." RP at 156. After the court unsuccessfully admonished him to answer the prosecutor's questions, it found him in contempt and appointed a public defender to represent him. After that, Mr. Bercier provided some testimony, although very little. Among his testimony was the following:

Q.     What do you recall telling the police officers?
A.     I remember I got shot at that night, but I really don't remember that much that happened, like, words or anything.
Q.     How many times were you shot at?
A.     Probably at least twice.
Q.     And how far away were the people shooting at you?
A.     I have no idea. I was in the store.

RP at 220-21.

Mr. Stromberg testified that when he saw Mr. Bercier running back toward the convenience store, "He was—he was running for his life. He wasn't paying attention to

anything in the store." RP at 233. But he, too, testified that Mr. Bercier had entered the store before shots were fired.

A person is guilty of first degree assault if he or she, with intent to inflict great bodily harm, "[a]ssaults another with a firearm . . . ." RCW 9A.36.011(1)(a). To uphold the conviction the State's evidence must be sufficient to prove each element of the crime—that a defendant such as Mr. Weatherwax, with "(1) intent to inflict great bodily harm, (2) assaulted (3) another (4) with a firearm." *State v. Elmi*, 166 Wn.2d 209, 214, 207 P.3d 439 (2009).

To prove the intent to inflict great bodily harm, the State need only prove Mr. Weatherwax intended to inflict that harm on some person—in this case, it could be Mr. Stromberg, Ms. Smith, or Mr. Bercier. *State v. Wilson*, 125 Wn.2d 212, 218, 883 P.2d 320 (1994). That, combined with proof that Mr. Bercier was assaulted with a firearm, would be sufficient evidence to sustain the conviction of the first degree assault of Mr. Bercier.

Washington recognizes three definitions of assault:

"(1) an attempt, with unlawful force, to inflict bodily injury upon another [attempted battery]; (2) an unlawful touching with criminal intent [actual battery]; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is capable of inflicting that harm [common law assault]."

21

*Id.* (alterations in original) (quoting *State v. Bland*, 71 Wn. App. 345, 353, 860 P.2d 1046 (1993), *abrogated on other grounds by State v. Smith*, 159 Wn.2d 778, 786-87, 154 P.3d 873 (2007)).

In closing argument, the prosecutor told the jury:

> Now, I think we have shown they were trying to hit Mr. Bercier, make no mistake about it. But if in your deliberations you have questions about that, even if they were just shooting the gun to scare him, even if you find that that is all this is about, there is still an assault being committed here.

RP at 702-03.[4]

"Proof that a defendant fired a weapon at a victim is, of course, sufficient to justify a finding of intent to kill." *State v. Hoffman*, 116 Wn.2d 51, 84-85, 804 P.2d 577 (1991). Evidence of the number of shots fired in the direction of Mr. Stromberg and Ms. Smith sufficed to establish the required intent to inflict great bodily harm.

Some evidence suggests Mr. Weatherwax could not have been attempting to inflict injury upon Mr. Bercier, because he likely saw that Mr. Bercier had taken cover in the store, and he did not shoot into the store. Given all that occurred, a reasonable fact finder could still conclude Mr. Weatherwax intended to put Mr. Bercier in apprehension of harm, however.

---

[4] Mr. Weatherwax argues Mr. Bercier's apprehension is not a necessary element of first degree assault, which is correct. Under the third alternative of assault, the victim's apprehension is not required; rather, it is the defendant's intent to cause apprehension that is relevant. *See State v. Stationak*, 1 Wn. App. 558, 559, 463 P.2d 260, (1969). The State did not contend otherwise at trial, nor does it on appeal.

22

Mr. Weatherwax's conviction for first degree assault of Mr. Bercier was supported by sufficient evidence.

*IV. Other sentencing errors*

Mr. Weatherwax and Mr. Rodgers argue resentencing is required not only to correct offender scores in light of reversal of the drive-by shooting convictions but also because other sentencing errors were made. In addition to challenging the application of RCW 9.94A589(1)(b) and the gang-related community custody provisions discussed above, they contend that the court erroneously imposed mandatory minimum sentences for the first degree assault charges, and unlawfully imposed other community custody conditions.

A. Mandatory minimum sentences

Both Mr. Weatherwax and Mr. Rodgers argue the trial court erroneously imposed five-year mandatory minimum sentences for their three assault convictions. "[I]llegal or erroneous sentences may be challenged for the first time on appeal." *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999). The State concedes error.

While the judges on the panel are not in total agreement as to *why* the mandatory minimum sentences were imposed in error, we accept the State's concession. We reverse the five-year mandatory minimum sentences for counts one, three, and four.

B. Other community custody provisions

One or both of Mr. Weatherwax and Mr. Rodgers challenge community custody conditions dealing with motor vehicles and marijuana.

*Motor vehicle conditions.* Each appellant's judgment and sentence includes a finding that the three drive-by shooting counts were felonies in connection with which the defendant used a motor vehicle. The finding is relevant to RCW 46.20.285, under which the Department of Motor Vehicles "shall revoke the license of any driver for the period of one calendar year upon receiving a record of the driver's conviction of [certain offenses]." One such offense is "[a]ny felony in the commission of which a motor vehicle is used." RCW 46.20.285(4).

In light of our reversal of the drive-by shooting convictions, the judgment and sentences entered upon resentencing should include no such finding.

Mr. Rodgers also challenges the condition included in his judgment and sentence that "[t]he defendant shall notify the [Community Corrections Officer (CCO)] of any vehicles owned or regularly driven by him/her," arguing that it is not crime-related. CP at 743.

"As part of any term of community custody, the court may order an offender to . . . [c]omply with any crime-related prohibitions." RCW 9.94A.703(3)(f). A "[c]rime-related prohibition" is an order that prohibits "conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW

24

9.94A.030(10). "'There must be some basis for the "crime-related" determination if the limitation is to have any meaning.'" *State v. Parramore*, 53 Wn. App. 527, 531, 768 P.2d 530 (1989) (quoting DAVID BOERNER, SENTENCING IN WASHINGTON § 4.5 (1981)).

We review the trial court's imposition of crime-related prohibitions for an abuse of discretion. *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). A court abuses its discretion when its decision is based on untenable grounds or untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). With the reversal of the drive-by shooting convictions, the requirement that Mr. Rodgers keep his CCO informed of vehicles owned or regularly driven does not relate directly to the circumstances of his remaining convictions. The condition should be excluded when Mr. Rodgers is resentenced.

*Marijuana.* Mr. Rodgers alone challenges the condition of community custody included in his judgment and sentence that orders him not to use or possess "Marijuana and or products containing Tetrahydrocannabinol (THC)." CP at 742. Relying on RCW 9.94A.703(2)(c), he argues the condition must be amended to reflect the statute's qualifier, "except pursuant to lawfully issued prescriptions." Br. of Appellant (Rodgers) at 23.

Marijuana remains a schedule I controlled substance. RCW 69.50.204(c)(22). The exception for prescribed use in RCW 9.94A.703(2)(c) does not apply, because one can never obtain a prescription for marijuana use. *See* RCW 69.50.308 (regulating the

25

dispensing and prescription of controlled substances). Even in the context of medical marijuana, the user obtains an "authorization," not a prescription, from a health care provider. RCW 69.51A.030(2)(a). There was no error; the condition is statutorily authorized.

## V. LFOs

Mr. Rodgers challenges the LFOs imposed by the trial court, arguing the court failed to inquire into his present or future ability to pay. He also argues the imposition of a $100 DNA[5] collection fee under RCW 43.43.7541 violates substantive due process as applied to him and other indigent defendants.

Mr. Rodgers failed to object to the LFOs at sentencing, but since we are remanding for resentencing we will forego our usual consideration of RAP 2.5(a). The trial court committed no error in imposing the LFOs without inquiring into ability to pay because each obligation imposed was mandatory. *See* RCW 7.68.035 ($500 victim assessment fee); RCW 36.18.020(2)(h) ($200 criminal filing fee); RCW 43.43.7541 ($100 DNA collection fee). "[F]or *mandatory* legal financial obligations, the legislature has divested courts of the discretion to consider a defendant's ability to pay when imposing these obligations." *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013).

---

[5] Deoxyribonucleic acid.

26

As to the constitutional challenge to the DNA fee, we recently held that in order to determine whether the fee imposed to help fund the collection of DNA samples and the maintenance and operation of DNA databases violates an indigent defendant's right to substantive due process, we need much more of a record than proof that the defendant qualified for court appointed counsel. *State v. Stoddard*, 192 Wn. App. 222, 228, 366 P.3d 474, (2016); *and see State v. Brewster*, 152 Wn. App. 856, 860, 218 P.3d 249 (2009) (addressing legislature's purpose in establishing the fee). A substantive due process challenge requires we apply a deferential standard of review and determine whether the challenged law has a rational relationship to any legitimate state interest. *Nielsen v. Dep't of Licensing*, 177 Wn. App. 45, 53, 309 P.3d 1221 (2013). The focus in the first instance is on the interest of the State, as to which no record whatsoever has been developed.[6]

The record is not sufficiently developed to permit review. *Stoddard*, 192 Wn. App. at 228-29.

---

[6] In determining whether a rational relationship exists, a court may *assume* the existence of any necessary state of facts it can reasonably conceive in determining whether a rational relationship exists between the challenged law and a legitimate state interest. *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 222, 142 P.3d 571 (2006) (citing *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993). The fact that the State is not obliged to present evidence in support of a rational relationship does not mean it should not be given the opportunity, however.

WEATHERWAX STATEMENT OF ADDITIONAL GROUNDS

In a pro se SAG, Mr. Weatherwax raises three additional grounds for review: that (1) insufficient evidence supports his convictions for the assaults of Mr. Stromberg and Ms. Smith, (2) insufficient evidence supports the conviction for unlawful possession of a firearm, and (3) the trial court erred when it admitted evidence of his gang membership.

*Assault of Mr. Stromberg and Ms. Smith.* Mr. Weatherwax alleges the State failed to establish he intended to assault Mr. Bercier, with the result that the doctrine of transferred intent cannot be used to establish an assault of either Mr. Stromberg or Ms. Smith.

First, Mr. Weatherwax misunderstands the operation of the applicable statute. In *Wilson*, the Supreme Court held that the doctrine of transferred intent "is only required when a criminal statute matches specific intent with a specific victim." 125 Wn.2d at 219. With first degree assault, "once the mens rea is established, RCW 9A.36.011, not the doctrine of transferred intent, provides that any unintended victim is assaulted if they fall within the terms and conditions of the statute." *Id.*

In addition, the evidence *most* clearly supported the required intent as to Mr. Stromberg and Ms. Smith. They were the two victims standing outside the store, within the line of fire. Sufficient evidence supports the convictions.

*Unlawful possession of a firearm.* Mr. Weatherwax challenges the sufficiency of the evidence to establish that he had actual or constructive possession of a firearm.

28

The evidence established that the owner of the home in which Mr. Weatherwax hid following the crime first saw the holstered Makarov semiautomatic pistol after Mr. Weatherwax arrived. She placed it in her dryer, where police found it. A forensic scientist with the Washington State Patrol Crime Laboratory testified Mr. Weatherwax was a partial major contributor to the DNA found on the holster. Also, Mr. Stromberg testified that when shots were fired, he saw two distinct muzzle flashes coming from separate areas, and only a short time before the shooting, Mr. Weatherwax and Mr. Rodgers were observed calling Mr. Bercier to come out of the convenience store and fight. Sufficient evidence supports Mr. Weatherwax's conviction of unlawful possession of a firearm.

*Admissibility of gang membership.* Finally, Mr. Weatherwax challenges the admissibility of evidence that he was a member of a gang. He argues (as his lawyer did before trial) that the evidence was inadmissible under ER 402, 403, and 404(b). He also argues the sentencing court abused its discretion when it considered gang evidence during sentencing.

Under ER 404(b), evidence of prior bad acts is not admissible to show the character of a defendant. It is, however, admissible to show motive. ER 404(b). "Motive is an inducement which tempts a mind to commit a crime," and although it is not an element of the offense that the State is required to prove, evidence showing motive may be admissible. *State v. Boot*, 89 Wn. App. 780, 789, 950 P.2d 964 (1998). Here, the

29

evidence of Mr. Weatherwax's involvement with the Norteño Red Boyz was admissible to explain his and Mr. Rodgers's motive and intent in calling Mr. Bercier out to fight, laying in wait for Mr. Bercier, chasing him back to the convenience store, and taking violent action. The trial court did not err in admitting evidence of Mr. Weatherwax's gang membership.

The trial court also did not err in considering Mr. Weatherwax's gang involvement during sentencing. The State had charged a gang aggravator and the jury returned a special verdict finding that the crimes against Mr. Bercier were committed for purposes of furthering a criminal street gang.

## RODGERS STATEMENT OF ADDITIONAL GROUNDS

In his pro se SAG, Mr. Rodgers raises two additional grounds for review: that (1) insufficient evidence supports his conviction for conspiracy to commit first degree assault and (2) insufficient evidence supports the conviction for first degree assault of Mr. Bercier.

*Conspiracy to commit first degree assault.* Under RCW 9A.28.040(1):

> A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

A formal agreement is unnecessary. *State v. Barnes*, 85 Wn. App. 638, 664, 932 P.2d 669 (1997). A conspiracy may be shown by concert of action, with the parties working

30

together understandingly with a single design for the accomplishment of a common purpose. *Id.* Circumstantial evidence may provide proof of a conspiracy. *Id.*

The evidence that Mr. Weatherwax and Mr. Rodgers acted in concert in calling Mr. Bercier out to fight, together with the evidence that they then laid in wait and chased him back to the store where they fired shots to cause him apprehension is sufficient to support the conspiracy conviction.

*First degree assault of Mr. Bercier.* Mr. Rodgers finally contends the State failed to prove he had the requisite intent to assault Mr. Bercier. The same issue was raised by Mr. Weatherwax's brief. As we have already explained, the evidence was sufficient.

We reverse the drive-by shooting convictions and the mandatory minimum sentences, and remand for resentencing consistent with this opinion.

Siddoway, J.

I CONCUR:

Korsmo, J.

31

PENNELL, J. (dissenting in part) — I join all but Section *I* (A) of the majority

opinion, addressing RCW 9.94A.589 and the rule of lenity.

The majority opinion departs from Division One's holding in *State v. Breaux*, 167

Wn. App. 166, 175-76, 273 P.3d 447 (2012), despite the State's concession of error and

request for resentencing under *Breaux*. While it is not unusual for a court to refuse an

erroneous legal concession, and it is not unusual for one division of this court to disagree

with a decision from another division, there appears to be little precedent for both

circumstances occurring simultaneously.

In the current context, the doctrine of stare decisis warrants accepting the State's

concession. "[Appellate courts] do not lightly set aside precedent, and the burden is on

the party seeking to overrule a decision to show that it is both incorrect and harmful."

*State v. Kier*, 164 Wn.2d 798, 804-05, 194 P.3d 212 (2008). Here, no party has taken on

this burden. By creating an uninvited conflict in the construction of RCW 9.94A.589, we

are unnecessarily complicating the law, upending settled expectations and risking

inequitable outcomes. I would not do so sua sponte.

An additional reason to invoke stare decisis is that we are dealing with an issue of

statutory interpretation.[1] The legislature can amend RCW 9.94A.589 if it disagrees with

---

[1] "Stare decisis is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. This is commonly true even where the error is a matter of serious concern provided correction can be had by legislation." *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S. Ct. 443, 76 L. Ed. 813 (1932) (Brandeis, J., dissenting) (citations omitted).

the construction set out in *Breaux*. Despite Division One's interpretation of RCW 9.94A.589(1)(b), the legislature has not changed the statute's language. The legislature amended RCW 9.94A.589 in 2015 but did not change the substance of subsection (1)(b). The legislature is presumed to have acted with knowledge of *Breaux*, and its failure to substantively amend the statute in the four years since *Breaux* suggests its acquiescence to the judicial interpretation. *See Buchanan v. Int'l Bd. of Teamsters, Chauffeurs, Warehousemen and Helpers*, 94 Wn.2d 508, 511, 617 P.2d 1004 (1980).

Based on the foregoing, I dissent from the majority opinion in part and would remand these matters for resentencing in light of *Breaux*, as well as the other errors set forth in the majority opinion.

Pennell, J.